IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )        No. 3:14-CR-160
v.                                  )
                                    )
RICKY WILLIAMS CLINE,               )        (VARLAN / SHIRLEY)
                                    )
            Defendant.              )

# REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and the Chief District Judge's Order [Doc. 37] for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. Defendant Cline asks [Docs. 35 & 59] the Court to suppress all evidence stemming from the November 28, 2013 warrantless stop and search of his vehicle, because the officers lacked reasonable suspicion to believe he was involved in a crime. He also calls for the dismissal of the Superseding Indictment [Doc. 43], arguing that law enforcement violated his right to due process of law by losing evidence in this case.

The Court briefly reviews the lengthy procedural history in this case. Two years and four months after the initial charge, the Government obtained a Superseding Indictment [Doc. 22], which differed from the original charge only in removing "ammunition" from the allegation that, on November 28, 2013, the Defendant, a convicted felon, possessed a firearm and ammunition. A month later, the Court permitted [Doc. 30] the Defendant to substitute counsel and appointed Attorney Michael B. Coleman to represent the Defendant. The Court continued the trial to September 7, 2016, and granted Mr. Coleman time to file motions.

On June 16, 2016, the Defendant filed a Motion to Suppress [Doc. 35] and a Motion for Production of Specific Brady Discovery [Doc. 36]. The parties appeared for a hearing on these motions on July 8, 2016. Assistant United States Attorney Cynthia F. Davidson and Mr. Jacob Ens, intern, appeared on behalf of the Government. Attorney Coleman represented the Defendant, who was also present. The Court heard evidence and argument on the Motion to Suppress. The Defendant filed a post-hearing brief [Doc. 42] on July 12, 2016, and the Government filed a responding brief [Doc. 44] on July 14, 2016.

Also, at the July 8 hearing, Mr. Coleman stated that the previous day, the Government provided him with a two-page narrative statement of Tennessee Wildlife Resource Agency (TWRA) Officer Kip Kite. At that time, he also learned that the Government could not locate the statements of two other TWRA officers. The Court extended the Defendant's deadline for filing dispositive motions in order for him to file a motion relating to the missing TWRA officer statements. On July 14, 2016, the Defendant filed a Motion to Dismiss Indictment for Violation of Defendant's Fifth and Fourteenth Amendment Right to Due Process [Doc. 43], with respect to the missing statements.[1]

The parties appeared before the undersigned on September 8, 2016, for a hearing on the Motion to Dismiss. AUSA Davidson represented the Government, and Mr. Coleman represented Defendant Cline. The Defendant presented the testimony of Mr. John Ruggiero, which Mr. Coleman argued is relevant to both the Motion to Dismiss and the Motion to Suppress. Because the Defendant raised an argument with regard to the legality of the deer

---

[1] Upon the Defendant's motion, the Court continued [Doc. 50] the trial to December 13, 2016, to permit time to litigate the Motion to Dismiss.

decoy operation not previously raised in either the suppression motion or the Motion to Dismiss, the Court reset the motion hearing to October 19, 2016.

On September 22, 2016, the Defendant filed an Amended Motion to Suppress [Doc. 59]. The Government responded [Doc. 60] in opposition on October 5, and the Defendant filed a reply brief [Doc. 61] on October 13. AUSA Davidson and Mr. Coleman appeared for a hearing on the amended suppression motion on October 19, 2016.[2] The Court heard the testimony and arguments of the parties and took the motions under advisement.[3]

For the reasons discussed in full below, the undersigned finds that although the TWRA officers properly stopped the Defendant, the firearm was improperly seized from his vehicle. Accordingly, the Court recommends that firearm be suppressed. The Court finds that the Defendant's statements at the scene of the stop may be admitted, despite the fact that they were unwarned. The Court also finds no basis to dismiss the Superseding Indictment.

## I. POSITIONS OF THE PARTIES

On Thanksgiving Day 2013, TWRA officers placed a decoy deer on private property and visible from Mannis Road in Monroe County, Tennessee, in response to citizen complaints about illegal hunting from the road. Later that day, a pickup truck stopped at the location from which the deer decoy was visible. About thirty seconds later, a van, driven by the Defendant, also stopped at that location. An individual exited the truck, shot at the decoy, returned to his truck, and fled. Defendant Cline pulled forward to allow the truck to leave and

---

[2] The Court notes that the Defendant failed to appear for this hearing, due to transportation problems.

[3] The Court granted [Doc. 64] the Defendant's oral motion to continue the trial and, by agreement of the parties, reset the trial to January 24, 2017.

3

then also left the location. A TWRA officer stopped the pickup truck, and another officer stopped the Defendant's van as he attempted to back away from the truck. While speaking with the Defendant beside his van, the officer observed a rifle inside the van and seized it. Based upon this series of events, Defendant Cline is charged [Doc. 22] with being a previously convicted felon and with possessing, in an affecting commerce, a firearm on November 28, 2013.

The Defendant asks the Court to suppress all evidence seized from his vehicle on November 28, 2013, as well as any statements by him, because the stop and warrantless search of his vehicle violated his rights under the Fourth Amendment. He argues that the TWRA officers lacked reasonable suspicion to stop his vehicle. He also contends that as a result of the illegal stop, the officer was not constitutionally at a vantage point from which he could view and seize the firearm. He contends that his statements made at the scene were unwarned. Finally, he argues that the good faith exception to the exclusionary rule does not apply in this case due to the illegal deployment of the deer decoy.

The Defendant also asks the Court to dismiss the Superseding Indictment, arguing that the Government's loss of two statements of TWRA officers,[4] made nearly

---

[4] The Defendant also contends that the TWRA or the ATF lost ammunition seized from his vehicle on November 28, 2013. The Court finds that the Superseding Indictment does not charge him with being a felon in possession of ammunition and, thus, the loss of this evidence would not be a basis to dismiss the Superseding Indictment. Moreover, at the July 8 hearing, AUSA Davidson denied that the ammunition was lost and stated that the "TWRA did not seize the ammunition in this case because it is not a violation of state law to possess ammunition." [Doc. 48, p.25] She explained that the Government removed the reference to ammunition from the charge in the Superseding Indictment because without the physical ammunition, the Government could not prove an interstate nexus. [Doc. 48, p.25] Special ATF Agent Lamar English testified at the October 19 hearing that he did not recall any ammunition being delivered into ATF custody in this case. Based upon the Government's proffered explanation and the absence of any contradictory evidence in the record, the Court finds that law enforcement did not lose the ammunition related to this case, because none was seized.

4

contemporaneously with the events giving rise to the charge, violate his right to due process of law under the Fifth and Fourteenth Amendments.[5]  He contends that the evidentiary and impeaching value of these statements was apparent and that the TWRA officers and Bureau of Alcohol Tobacco and Firearms (ATF) agents acted in bad faith in failing to preserve them. Finally, he maintains that he does not have other, similar evidence that he can use to impeach the TWRA officers.

The Government responds that the TWRA officers properly stopped the Defendant's van on November 28, 2013, based upon reasonable suspicion of an ongoing crime. It contends that the TWRA officer seized the rifle pursuant to the plain view exception to the warrant requirement.  The Government maintains that, even if the deployment of the deer decoy was unlawful, it was sufficiently attenuated from the stop of the Defendant.  Alternatively, the Government contends that the TWRA officers stopped the Defendant for attempting to flee a traffic stop and, thus, properly arrived at the location from which they could view the rifle.  The Government also argues that a reasonable person would believe a hunting rifle is evidence of a hunting violation and, therefore, the TWRA officer properly seized the rifle from the Defendant's van pursuant to the plain view exception.  Finally, the Government argues that the Defendant was not subject to custodial interrogation at the scene of the stop and, thus, the Miranda warnings were not required.

---

[5]In the introduction to his Motion to Dismiss, the Defendant also argues that the loss of the TWRA officers' statements violate his Sixth Amendment right to compulsory process.  The Defendant makes no further argument with regard to an alleged Sixth Amendment violation. Accordingly, the Court deems the issue of a Sixth Amendment violation to be waived.  See, e.g., United States v. Robinson, 390 F.3d 853, 886 (6th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997))).

5

The Government also argues that the TWRA statements are Jencks material, not evidence, and that the loss of Jencks material is not a basis for dismissal of the charge. It contends that, even if the missing statements could be considered evidence, they would be, at most, only potentially exculpatory evidence, and, thus, the Defendant bears the burden of showing that the TWRA officers or the ATF agents acted in bad faith and that he cannot get comparable evidence by reasonably available means. Here, the Government contends that no evidence of bad faith exists and that both TWRA officers are available to testify.

## II.    SUMMARY OF TESTIMONY

At the July 8 hearing, the Government presented the testimony of TWRA Wildlife Officer Kip Kite and TWRA Sergeant Ben Davis.

Officer Kip Kite testified that he has served as a TWRA officer since 2004 and is charged with enforcing all Tennessee hunting, fishing, and boating laws. [Tr. at 47][6] He said in November 2013, he and his partner TWRA Officer Joe Pike had received several complaints of individuals hunting illegally from the road in the area of Mannis Road and Rocky Springs in Monroe County. [Tr. at 47] He stated that they decided to conduct a deer decoy detail on Thanksgiving morning of 2013. [Tr. at 47] He explained that in a deer decoy detail, the officers set up a full-size mounted deer at a location from which a hunter could see it from the road. [Tr. at 48] He stated that TWRA officers are located on either end of the road to stop individuals fleeing the scene of the deer decoy in either direction. [Tr. at 48] He said prior to conducting the instant deer decoy detail, they got permission from the landowner to locate the decoy deer on

---

[6] The transcript [Doc. 48] of the July 8 hearing was filed on July 29, 2016.

private land adjacent to Mannis Road.  [Tr. at 51]  He said they placed the decoy deer at the edge of a field about eighty (80) to one hundred (100) yards from Mannis Road.  [Tr. at 51]

Officer Kite stated that around 8:30 a.m., on November 28, 2013, he and Officer Lee hid in the woods on an embankment overlooking Mannis Road and with a clear line of sight to the decoy deer.  [Tr. at 51-52]  He stated that Officer Pike was in his vehicle on one end of Mannis Road, and Sergeant Davis and Officer Gray were in another vehicle on the other end of Mannis Road.  [Tr. at 53]  Officer Kite said that around 9:45 a.m. to 10:00 a.m., a silver van drove past the location of the deer decoy and continued north on Mannis Road.  [Tr. at 53-54] He  said he noticed that the driver was wearing camouflage.  [Tr. at 54]  Officer Kite said that the van did not slow down or stop in the vicinity of the decoy deer.  [Tr. at 54]

Officer Kite testified that approximately thirty (30) minutes later, a purple Toyota pickup truck came from the north, heading south, on Mannis Road; pulled into a short driveway; and stopped in front of a gate to the field containing the decoy deer.  [Tr. at 55]  Officer Kite testified that the pickup truck did not hesitate but pulled directly into the driveway.  [Tr. at 55] He said that less than a minute later, the silver minivan that he had seen earlier that morning pulled in close behind the pickup, preventing the pickup from backing out of the driveway.  [Tr. at 55-56]   He said the driver of the minivan appeared to be the same individual he had seen earlier.  [Tr. at 55]  He said he assumed that the drivers of the pickup truck and the minivan were working together based upon the minivan having passed the decoy earlier and the deliberate way in which the pickup pulled into the driveway.  [Tr. at 58]  Officer Kite said that an individual heading south on Mannis Road would not have been able to see the decoy deer without pulling into the driveway.  [Tr. at 58]

Officer Kite said that he noticed the driver of the pickup, whom he later learned was William Frank, fumbling around inside the truck. [Tr. at 56] He stated that Frank got out of the truck and shot at the decoy deer. [Tr. at 56]. Officer Kite testified that the silver minivan pulled forward to allow the pickup to back out of the driveway. [Tr. at 57] He stated that after backing up, the pickup truck paused, Frank and the Defendant exchanged "a hand signal or something," the pickup sped away, and the minivan followed it. [Tr. at 57]

Officer Kite stated that during the entire incident, he and Officer Lee were in radio contact with the stopping officers, Officer Pike and Sergeant Davis, describing the events as they unfolded. [Tr. at 57] He said he advised the stopping officers that Frank had just shot at the decoy deer and that both vehicles were traveling toward Officer Pike. [Tr. at 57-58] He said he radioed for the stopping officers to stop both vehicles because they are working together. [Tr. at 58]

On cross-examination, Officer Kite testified that he is somewhat familiar with traffic offenses and conducts traffic stops in connection with deer decoy details. [Tr. at 61] He agreed that the TWRA officers stopped Frank on that day because he witnessed Frank commit a misdemeanor wildlife violation. [Tr. at 63] He agreed that the location of the deer decoy detail was in Madisonville, which is a small city in a rural county. [Tr. at 64] He agreed that the area around Mannis Road as a rural residential area interspersed with small farms. [Tr. at 66] Officer Kite also agreed that a licensed individual can hunt in Monroe County on private land with the permission of the landowner. [Tr. at 67] He agreed that he was familiar with the behavior of deer and that it is common to find deer on the edge of a field. [Tr. at 68] He said that deer are "browsers," meaning that they eat woody stems and branches as they move through the woods. [Tr. at 70]

8

Officer Kite stated that Mannis Road is a narrow, curvy, two-lane country road. [Tr. at 78-79] He said that Mannis Road is paved. [Tr. at 79] He said prior to setting up the deer decoy detail on November 28, 2013, landowners on Mannis Road had reported that people were shooting at deer from the road. [Tr. at 82-83] A couple of days before November 28, he called the owner of the land where he wanted to set up a decoy deer and received permission to conduct a deer decoy detail on the property. [Tr. at 93] He said this landowner did not live in Tennessee. [Tr. at 94] He stated that the decoy deer was placed at the back of a field in some tall grass and trees. [Tr. at 84] He said that the decoy deer was placed in this location so that an individual traveling northbound on Mannis Road would have to be looking for it in order to see it. [Tr. at 84-85] Officer Kite said that during the deer decoy detail on November 28, 2013, he and Officer Lee were located on an embankment eight to ten feet from Mannis Road. [Tr. at 82] He said Officer Lee was making a video recording using a video camera on a tripod. [Tr. at 79-80] Officer Kite identified the video recording [Exh. 3] of the incident involving the Defendant. [Tr. at 81-82]

Officer Kite testified that around 9:45 a.m., on November 28, 2013, a silver minivan drove northbound on Mannis Road and passed the location of the decoy deer. [Tr. at 88-89] A few cars had driven past the location of the decoy deer that morning, but none, including the silver minivan, stopped or braked as they went past. [Tr. at 89] Officer Kite stated that from his location on the embankment, standing up and looking through binoculars, he could look into the passing vehicles, and he saw that the driver of the minivan was wearing camouflage. [Tr. at 90, 97] He said that it was not uncommon to see people in Madisonville wearing camouflage. [Tr. at 91] He agreed that about thirty minutes elapsed between the silver minivan driving past and the incident. [Tr. at 91]

9

Officer Kite testified that a purple pickup truck with a single occupant pulled into the driveway across from the decoy deer. [Tr. at 92] He said roughly thirty seconds elapsed before the second vehicle pulled up. [Tr. at 95] Officer Kite said that although the silver minivan is not visible on the video recording, he was standing to the left of the video camera, viewing the scene through binoculars; and he could seek the minivan the entire time. [Tr. at 97] He said the driver of the minivan did not get out. [Tr. at 95] Officer Kite testified that after the truck backed out of the driveway, the driver of the minivan opened his door, but at that time the windows were up on the truck. [Tr. at 99] He agreed that the driver of the minivan and the driver of the truck had no audible communication, but he believed that one of the drivers was waving his hands based on his shoulder movements. [Tr. at 99] Officer Kite said he radioed to the other officers to stop both vehicles because they are together. [Tr. at 101]     Officer    Kite agreed that during the entire incident, no one from the minivan produced a weapon or shot at the decoy. [Tr. at 102]

Officer Kite said that within a week of the incident on November 28, 2013, he prepared a report on his computer and printed it. [Tr. at 71] He said he did not save the report on his computer but, instead, closed the computer without saving it. [Tr. at 72, 75] He said that the TWRA had changed computers after he created the report. [Tr. at 75] He gave the sole, printed hard copy of the report to ATF Agent Marty English at a meeting at the Monroe County Sheriff's Office. [Tr. at 72, 75] Officer Kite said that Frank and the Defendant were given citations for committing wildlife violations on November 28, 2013. [Tr. at 73] He stated that citations contain five carbon copies. [Tr. at 73] On one copy of the citation, the officer describes the location and nature of the violation, whether it involved big game, and whether any

weapons were seized. [Tr. at 74] Officer Kite testified that pursuant to the policies and procedures of his agency, he was not required to keep a copy of the citation. [Tr. at 74]

Officer Kite stated that ATF Agent Freeman interviewed him around November 6, 2014, almost a year after the incident. [Tr. 75-76] He said TWRA Officers Davis and Pike were also present for that interview. He said Agent Freeman made a report in connection with that interview. [Tr. at 77]

On redirect examination, Officer Kite testified that he created the narrative report at issue in this case after the ATF got involved with the case and that this report was not a normal report of the TWRA. [Tr. at 103] He said typically, in enforcing the wildlife laws, TWRA officers only fill out the narrative, describing the facts of the violation, on the citation. [Tr. at 103] He stated that he created the additional narrative report in this case at the request of the ATF. [Tr. at 103] Officer Kite testified that, based on his experience, he believed that the driver of the silver minivan saw the decoy deer when it drove by earlier, told his friend about the deer, and the two returned to shoot the deer. [Tr. at 104] He said the stopping officers, Officers Pike and Davis, were waiting for his direction to stop a vehicle. He said shooting from a public road is a wildlife violation, and he assumed that the shooter did not have permission of the landowner to hunt on the property. [Tr. at 105] Thus, he said there were two and possibly three violations that provided cause to stop the vehicles. [Tr. at 105]

On recross-examination, Officer Kite agreed that he produced the narrative report in his official capacity. He also agreed that part of his basis for believing the driver of the minivan was with the driver in the truck was the fact that the minivan had driven by earlier, traveling in the direction from which the decoy deer could be seen. [Tr. at 106]

Sergeant Ben Davis testified that he has worked as a TWRA wildlife officer for eleven years, the last four of which he has been a sergeant. [Tr. at 109-10] Before working for the TWRA, he worked as a conservation officer in Alabama for six years. [Tr. at 110] He said the primary responsibility of the TWRA is enforcing Tennessee's hunting, fishing, trapping, and boating laws. [Tr. at 111] Sergeant Davis said on November 28, 2013, the TWRA conducted a deer decoy operation in response to citizen complaints about people shooting wild deer from a public road in Monroe County, Tennessee. [Tr. at 111] He said in a deer decoy operation, the TWRA locates two manned agency vehicles at either end of the road on which the deer decoy is located in order to prevent a shooter from escaping and to stop other people from entering the area, if a shooter is present on the road. [Tr. at 112] He said that during the November 28, 2013 operation, he was on one end of Mannis Road and Officer Pike was on the other. [Tr. at 112] Officer Gray, a probationary TWRA officer was in his vehicle with him. [Tr. at 113] Sergeant Davis said that he could not see what was occurring at the deer decoy site, but he was listening on his radio. [Tr. at 113] He said that he heard over the radio that someone had shot the decoy deer, and he began driving in that direction.

Sergeant Davis stated at the time of the November 2013 deer decoy operation, he had a new camera that rested in a cradle on the dash of his vehicle. [Tr. at 114] He said this camera could also be clipped to his uniform to serve as a body camera. [Tr. at 115] Sergeant Davis testified to the events depicted on a video recording [Exh. 4] taken while the camera was on his vehicle's dash on the day of the deer decoy operation. [Tr. at 114-  ] Sergeant Davis said as they passed the location of the decoy, Officer Gray asked, "Is that the gate where they shot?" [Tr. at 115] After traveling past the decoy site, they traveled to a hill, and he could see the blue

12

lights of Officer Pike's vehicle flashing at the top of the hill, where Officer Pike had stopped a vehicle. [Tr. at 115-16]

Sergeant Davis said he saw a silver vehicle backing down the hill at a "fairly high rate of speed," and he blocked the silver vehicle from continuing down the hill. [Tr. at 116] He said the blue lights and siren on his vehicle were activated, so the individual in the silver vehicle should have known to stop. [Tr. at 116] Sergeant Davis said as the silver vehicle backed into a driveway of a residence, the driver was leaning toward the center of his vehicle. [Tr. at 116-17] Sergeant Davis said he got out of his truck and told the driver of the silver vehicle to show his hands. [Tr.at 117] After Sergeant Davis repeated this command, the driver raised his hands. [Tr. at 117] Sergeant Davis walked up to the vehicle and removed the driver. [Tr. at 117] He said he frisked the driver for weapons, because in illegal hunting violations, it is common for all participants to be armed. [Tr. at 117] Sergeant Davis said he knew from the radio report that the driver was involved in a hunting violation that involved a weapon, so he frisked him for officer safety. [Tr. at 118] Sergeant Davis said he removed a .270 Winchester round, which is a common deer-hunting caliber for a rifle, from the front pocket of the driver's pants. [Tr. at 118-19] He placed the round on the front seat of the vehicle through the open door. [Tr. at 120] He said the driver was dressed in typical deer-hunting attire, including a shirt with a hood with blaze orange lining. [Tr. at 119] Sergeant Davis said Tennessee law requires big game hunters to wear 500 square inches of blaze orange to help other hunters distinguish them. [Tr. at 119-20]

Sergeant Davis stated that after he frisked the driver, he could see inside the vehicle. [Tr. at 122] He said, while standing beside the vehicle with the driver, he looked through the side window behind the driver's seat and saw the muzzle of a rifle protruding from between the two

13

front seats and pointing toward the rear of the vehicle. [Tr. at 122] He said that a camouflage jacket covered part of the rifle, which was laying between the driver's and passenger's seats. [Tr. at 122-23] Sergeant Davis stated that he saw the rifle without entering the vehicle. [Tr. at 122] He said that he thought the rifle was being used for deer hunting, which was the crime he was investigating, so he removed the rifle from the vehicle and removed three .270 Winchester rounds from the rifle. [Tr. at 123] He said the rounds in the rifle had the same head stamp as the round in the driver's pocket. [Tr. at 124]

Sergeant Davis said he asked the driver, whom he identified as Defendant Cline, what he was doing. [Tr. at 124] He said he did not advise the Defendant of his Miranda rights but, instead, asked the questions he typically asks when investigating a wildlife violation. [Tr. at 129] He said he asked the Defendant for his name, where he was from, whether he had identification, and to whom the vehicle belonged. [Tr. at 129] After running the license plate number on the vehicle, he discovered the tags "didn't match" and notified the Monroe County Sheriff's Department. [Tr. at 129] The van was registered to Donna Frank. [Tr. at 130] The Defendant indicated the rifle taken from the van was not his and that it belonged to Donna Frank. [Tr. at 124, 130] The Defendant said he had been hunting with a muzzleloader earlier that morning but had returned the muzzleloader to his residence. [Tr. at 124, 130]

Sergeant Davis said he searched a camouflage fanny pack that he saw in the back of the van for guns, knives, and other evidence of illegal hunting. [Tr. at 124] Sergeant Davis said the fanny pack contained deer-hunting equipment but that he did not find any equipment, including speed or powder loads, for a muzzleloader in the van. [Tr. at 124-25] Sergeant Davis said the Defendant was not arrested or placed in handcuffs. [Tr. at 125] He said Officer Pike

14

cited the Defendant for wildlife violations. [Tr. at 125] Sergeant Davis explained that the individual in the other vehicle that day was Donna Frank's son, and he was also cited for hunting violations. [Tr. at 131]

Sergeant Davis stated that following the deer decoy operation, Special ATF Agent Marty English contacted him and told him the ATF was going to prosecute the Defendant. [Tr. at 131-32] Agent English asked the TWRA officers involved in the November 28, 2013 deer decoy operation to create a narrative statement of their involvement that day. [Tr. at 132] He said this statement was not a report that he would normally generate in the course of his duties as a TWRA wildlife officer. [Tr. at 131] Sergeant Davis said he wrote the statement, printed it, and gave the hardcopy to Agent English, when he met with Agent English a few days later. [Tr. at 132] He did not keep a copy of his statement, nor did he save it on his computer. [Tr. at 132-33] He said that he did not maintain a file on Defendant Cline. [Tr. at 133] All that the TWRA retained was a copy of the citation given to the Defendant when he was stopped. [Tr. at 133]

On cross-examination, Sergeant Davis testified that approximately one week after the incident on November 28, 2013, he typed a statement about the incident for the ATF, which was conducting a criminal investigation of the Defendant. [Tr. at 137-38] He said he created this statement as a part of his law enforcement duties but that he would not create this type of a statement as a normal part of a misdemeanor citation. [Tr. at 138-39] He gave this statement to Agent English, and he does not know what happened to it after that. [Tr. at 138] He said that although he could send email on his computer, he did not email the statement. [Tr. at 139] He said the TWRA policies and procedures manual does not require officers to keep a copy of an official report.

15

Sergeant Davis stated that all of the officers involved in the deer decoy operation on November 28, 2013, had been briefed on the complaints about shooting in the area before the decoy was deployed. [Tr. at 141] He said Officer Kite radioed that the driver of the truck just shot and to come and get "them." [Tr. at 151] He stated that Officer Kite radioed that there was a van behind the truck. [Tr. at 151] He said that Officer Pike asked, over the radio, if the vehicles were traveling toward him. [Tr. at 152] He said Officer Kite radioed, "Yes, he's coming toward you right now" and that the silver minivan was behind the truck. [Tr. at 152] Sergeant Davis agreed that no one indicated that the driver of the minivan had shot at the decoy, had a weapon, or had done anything other than be present at the scene. [Tr. at 152-53]

Sergeant Davis said he activated the camera on the dash of his vehicle as he pulled out onto Rocky Springs Road, after Officer Kite radioed about the truck and van heading toward Officer Pike. [Tr. at 142] He testified that his emergency lights and siren were not activated when he drove past the location of the decoy deer. [Tr. at 144] He said that when he came around the corner, he saw a vehicle backing toward him and activated his blue lights and siren. [Tr. at 145]

Sergeant Davis said he jumped out of his car, walked toward the silver vehicle, and twice asked the Defendant to show his hands, raising his own hands to demonstrate the second time. [Tr. at 146] He said in the excitement of the moment, he did not take the camera with him and so the video and audio are recorded from inside his vehicle. [Tr. at 146] Sergeant Davis did not recall if the Defendant rolled his window down and was not aware that the Defendant's window did not work. [Tr. at 148] Sergeant Davis said, at the time he asked the Defendant to raise his hands, the Defendant was not free to leave because Davis was conducting an investigative stop. [Tr. at 149] Sergeant Davis agreed the questions he asked the Defendant

16

at this point were custodial interrogation. [Tr. at 149] He agreed it took him about five seconds to walk to the Defendant's van and that the Defendant was out of his van within ten seconds of the time Sergeant Davis got out of his vehicle. [Tr. at 150]

Sergeant Davis said he frisked the Defendant to insure he did not have any weapons. [Tr. at 150] He said he had been told that the Defendant was involved in a hunting violation and he knew persons engaging in hunting violations are normally armed. [Tr. at 150] He said as he frisked the Defendant, the Defendant placed his hands on the top of the van, behind the driver's side door. [Tr. at 154-55] He said that as he frisked the Defendant, he looked through the window on the side of the van and saw the front of a rifle. [Tr. at 156] He said the back of the van was open between the driver's and passenger's seats and a row of seats in the back. [Tr. at 157] Sergeant Davis testified that when he removed the round of ammunition from the Defendant's pocket, he placed it on the driver's seat. [Tr. at 153] He said that, at this point, he could see the entire length of the driver's and passenger's seats. [Tr. at 153] Sergeant Davis said he leaned into the van, removed a piece of clothing laying on top of the rifle, removed the rifle from the van, and placed it in the front seat of his vehicle. [Tr. at 158-59]

Sergeant Davis stated that he is aware that a convicted felon cannot possess a firearm in Tennessee, but he is not familiar with sections 55-8-104, 55-10-205, or 39-16-603 of the Tennessee Code. [Tr. at 159-60] He said he did not recall talking to Mr. Frank during the stop, nor did he know whether Frank gave a statement, because Officer Pike talked with Frank. [Tr. at 160] He said that the Defendant said he had been hunting with a muzzleloader, which is not illegal. [Tr. at 160-61] Sergeant Davis said the fanny pack inside the van contained hunting paraphernalia, such as a knife and a grunt call, but did not contain materials for hunting with a muzzleloader, such as speed loads. [Tr. at 161] He agreed that hunters who hunted with

17

muzzleloaders did not always carry speed loads. [Tr. at 161] He said one of the officers at the scene ran the license number on the Defendant's van, and he learned that the van was not registered to the Defendant. [Tr. at 161-62] He said he understood that William Frank, the individual who shot at the decoy, was related to the owner of the minivan but not to the Defendant. [Tr. 162]

On redirect examination, Sergeant Davis testified that he had previously investigated hunters working together and that, in such situations, it was common for both hunters to be armed. [Tr. at 163] On recross-examination, he acknowledged that not every hunter hunts with someone else. [Tr. at 163]

At the September 8 hearing, the Defendant presented the testimony of John Ruggiero. Mr. Ruggiero testified that he lives at 688 Mannis Road in Madisonville, which is in Monroe County, Tennessee. He said he had owned this property for fourteen years and that he resided there on November 28, 2013. He identified a Warranty Deed [Exh. 5] for property on Mannis Road. Mr. Ruggiero reviewed the TWRA video [Exh. 3] of the activities near the deer decoy detail on November 28, 2013. He testified that this video depicts his property and that he recognized his gate on the video. He said the clearing behind the gate was his property. He said that he no longer owned the property depicted in the video but that he had purchased it on September 5, 2003, and owned it up until December 11, 2014. Mr. Ruggiero stated that law enforcement did not contact him regarding the use of his land on Thanksgiving Day of 2013, nor in the preceding week, month, or year. He stated that he did not give permission to anyone to conduct a live fire detail on his property on Thanksgiving Day of 2013, nor in the preceding week, month, or year.

18

On cross-examination, Mr. Ruggiero stated that he had never contacted law enforcement regarding people hunting deer on his property. He denied ever discussing people hunting from the road with his neighbors. He said that he lived with his wife Bonnie and that no one else lived on the property. On redirect examination, Mr. Ruggiero said he was a resident of Tennessee for all of 2013.

At the October 19 hearing, the Government presented the testimony of TWRA Wildlife Officers Joe Pike and Kip Kite and of ATF Agents Jason Dobbs, Lamar English, and James Freeman.

Special ATF Agent Jason Dobbs testified that he had worked for the ATF since 2008. He said that the Cline case was originally assigned to Agent English, then it was assigned to Agent Freeman, and when Agent Freeman transferred to Kentucky in March 2015, the Cline case was assigned to him. At that time, Defendant Cline's case was already pending in this Court. Agent Dobbs said he reviewed the computer file and the paper file on Defendant Cline. He said that after an indictment is filed, his job is to facilitate and see the case through the prosecution. He said he did not conduct any investigative activity on the Cline case.

Agent Dobbs stated that the ATF has a computerized file-system called NFORCE. This system allows agents to create reports directly on the computer. He stated that a paper case file also exists for each case. All documents—reports, judgments, criminal history, photographs, etc.—related to a case are scanned into the computer file and kept in electronic form. Agent Dobbs said that if a hard copy of a document exists, it is kept in the paper case file. He said it is the policy of the ATF to keep all statements relating to a case.

Agent Dobbs testified that the Cline case was set for trial in April 2016. In preparation for trial, he met with AUSA Davidson and the TWRA officers. During that meeting,

one of the TWRA officers commented that he had prepared a written statement summarizing what he saw on the day of the incident. Agent Dobbs said he checked the Cline file and could only locate the statement of Officer Kip Kite. He stated that TWRA Officers Ben Davis and Joe Pike told him that they also prepared written statements, but he could not locate their statements in either the ATF's computer file or its paper file. Agent Dobbs said at this point, the case was three years old, and the TWRA officers could not recall to whom they had given their statements. He said some of the TWRA officers believed they had given their statement to Sergeant Ben Davis to pass on to Agent Marty English. Agent Dobbs stated that he looked through all possible files and could not find the missing TWRA officer statements.

Agent Dobbs said he instructed the TWRA officers to look for the missing statements. He said after checking for the statements, they told him that they did not find them. Agent Dobbs said he did not destroy the statements of TWRA Officers Pike and Davis and that he had never seen these statements. Agent Dobbs said at the meeting with AUSA Davidson, the TWRA officers reviewed the events of November 28, 2013, and their recollection of that day was the same as related in the reports of Agents Freeman and English.

Agent Dobbs testified that after the September 8 hearing, at which Mr. Ruggiero testified, he reviewed the map of Mr. Ruggiero's property at the state property assessor's office. Agent Dobbs said he and TWRA Officer Kip Kite went to Mannis Road to the location of the deer decoy detail. Officer Kite showed him where the decoy deer had been placed. He said a new property marker was on the property and the spot where the decoy deer had been was several feet behind it. Based upon the property marker and the map, he believed the decoy deer was placed on the property of Sondra Strickland, who owned seventy-one acres that abutted Mr. Ruggiero's land. Agent Dobbs said he spoke with Ms. Strickland, who lives in Murfreesboro,

Tennessee.  Ms. Strickland told him that she had inherited the property in Monroe County but never lived there.  She told Agent Dobbs that three years ago, she called the TWRA to complain of hunting on her land.  She told him that she did not recall being asked about a decoy deer but that she would have been fine with it.  Agent Dobbs acknowledged that the driveway area was on Mr. Ruggiero's property and that the TWRA officers would have had to have crossed Mr. Ruggiero's property to get to the location on Ms. Strickland's property where they placed the decoy deer.

On cross-examination, Agent Dobbs testified that he was the third ATF agent involved with the Cline case.  He stated that before he was assigned to the case, he assisted Agent English with the arrest of the Defendant.  He said that although he reviewed the Cline computer file when he was first assigned to the case, he did not review it in depth until the Government was preparing for trial.  He agreed that he did not review the paper file in preparation for trial.  He said he reviewed the paper file at the time of the Superseding Indictment earlier this year.

Agent Dobbs said, generally, witness statements are attached to the agent's report of investigation in the file but witness statements can be placed in the file separately.  He said that everything in the paper file is not scanned into the computer file, although the ATF has emphasized the scanning of documents in the last few years.  He said it was not unusual to request a statement from an officer in another agency, but it was not standard or required.  He stated that it was up to the case agent to determine whether he wanted statements from officers.  Agent Dobbs said it was unusual that two of the three TWRA officers statements were not in the Cline file and that they should be there.  He said Officer Kite's statement was located only in the

paper file. The other two statements were not in either the computer or the paper file. He agreed that ATF agents were required to maintain all reports.

Agent Dobbs stated that the property line dividing Mr. Ruggiero's property and Ms. Strickland's property makes a "dog leg." He said the red iron gate in the video is on Mr. Ruggiero's property. He acknowledged that the only way for the TWRA officers to place the decoy deer was to walk over Mr. Ruggiero's property and that shots at the decoy deer would have been fired over Mr. Ruggiero's property. He said the location of the decoy deer was based upon Officer Kite's memory. He said the new property marker he saw was a rebar stake in the ground with pink tape tied to it. He agreed that the tree line could have moved in the three years since the incident. He admitted that he had no personal knowledge of what occurred at that location three years earlier.

TWRA Wildlife Officer Joe Pike testified that he had worked as a wildlife officer for Tennessee for twenty-six years. He said his job was to enforce all wildlife, fishing, and boating laws in Tennessee. He said on November 28, 2013, the TWRA placed a deer decoy detail off Mannis Road in Monroe County. He said the TWRA had complaints from landowners on Mannis Road that deer were shot on their property from the road. One landowner complained of dead deer in his field. Officer Pike said that Thanksgiving Day is a big day for deer hunting. He said the TWRA traditionally has a decoy deer on Thanksgiving Day and locates "stop vehicles" on the ends of the road where the decoy is stationed.

Officer Pike said on November 28, 2013, he and his partner Officer Kip Kite worked together to set up the decoy deer. He said Officer Ben Davis was there and another officer. Officer Pike stated that he was acting as the stop vehicle at a deer decoy detail and that he stopped Mr. Frank. Officer Pike said the Defendant was traveling right behind Mr. Frank and

that, when he stopped Frank, the Defendant began backing up. He said the Defendant was not arrested on that day. Instead, he wrote a citation for the Defendant for shooting from a public road. He said he wrote the citation because Monroe County was in his region and so that an officer from another county would not have to come to court in Monroe County. He said that TWRA citations have five copies. He said one copy goes to the defendant, one goes to the court, and three are in-house copies.

Office Pike testified that later, a Monroe County detective called Officer Pike and told him that the ATF wanted to be involved in this case. He said ATF Agent Marty English asked him to prepare a written narrative of the events of November 28, 2013. He said within two weeks of the incident, he wrote this statement on his work computer, which is connected to the Internet but is not networked with the other TWRA computers. He said he did not save his written narrative. He said he viewed this statement to be a witness statement for the ATF and that it was not a traditional TWRA report. He said that the TWRA has no policy requiring him to maintain the written narrative in a TWRA file. He believed that he sent the statement to Agent English by email. Alternatively, he would have hand delivered it to Agent English.

Officer Pike said that whether the TWRA created a case file for a case varied depending on the officer or the case. He said all boating accidents have a case file but that it was not mandatory to keep a case file on a wildlife violation. He said that he keeps a paper file and a computer file on large cases involving wildlife violations.

Officer Pike testified that in April 2016, when the Government was engaged in trial preparation on the Cline case, AUSA Davidson ask him to search for his written statement. He said he did not find it. He said that sometime after the 2013 incident, the TWRA swapped

out his laptop computer and did not transfer any of the data over to his new computer. He said that he did not intentionally lose or destroy the narrative statement he created for Agent English.

On cross-examination, Officer Pike said that he assisted Officer Kite in placing the decoy deer for the detail on November 28, 2013. He said Officer Kite placed the body of the decoy deer and he carried the head. He said they located the decoy deer outside the woodline in some brush next to a field. He said the decoy deer was not clearly visible. Officer Pike stated that a landowner on Mannis Road showed them this field, but he did not recall the landowner's name or contact information. He said that Officer Kite, not him, had spoken with the landowner about placing a decoy deer on the property. He said he waited one to one and one-half miles down Mannis Road from the decoy deer and that Officer Davis was three-fourths of a mile away.

Officer Pike stated that he stopped Mr. Frank's vehicle and Officer Davis stopped the other vehicle. He said he did not get a statement from Mr. Frank. Officer Pike said he wrote citations to both Frank and the Defendant. He said that because he issued misdemeanor citations, neither Frank, nor the Defendant were arrested. He said that the Monroe County Sheriff was involved because there was a question about the registration of the vehicle the Defendant was driving. He said the TWRA officers called a Monroe County officer to the scene so that the Monroe County officer could handle the traffic violation.

Officer Pike said Monroe County Detective Jones put Officer Pike in contact with Agent English, who was the ATF agent who worked on cases in that area. Officer Pike said that it was not unusual for him to testify about his personal knowledge of events but that he had never written a witness statement for ATF before this case. He said that he expected the ATF to keep a copy of his statement. He said as a witness, he did not think he had to keep a copy of his statement. He said that if he saved the statement, it was saved only to his computer, not to a

common database. He said he used his State computer as a part of his work as a TWRA officer. Officer Pike said the TWRA changed their laptop computers out and that he did not know where the old computers were now. He said he felt confident that he emailed his statement to Agent English.

Officer Pike asked to clarify his testimony about the placement of the decoy deer. He said he was with Officer Kite when he chose the location for the decoy deer several days before November 28, 2013. He said he typically goes with Officer Kite to place the decoy deer but that Officer Kite had another officer with him that day, so Officer Pike did not go with him. Officer Pike said he was not involved with setting the decoy deer on the ground on November 28, 2013.

Special ATF Agent Lamar F. English testified that he has been a federal employee for twenty-five years and has worked for the ATF for fifteen years. He said he worked in the Knoxville ATF office from 2010 to 2014, when he was transferred. He said he began investigating the Defendant sometime before Thanksgiving in 2013. He said the Defendant's name had come up in a related investigation as someone involved in various nefarious groups. He said he had no independent recollection of talking to the TWRA officers involved or of asking them to provide written statements. He said it was not his normal practice to ask for written statements and that he did not remember getting any in this case. He said that if he had received a witness statement, he would scan it into the computer file. He said the computer file on Defendant Cline contained over fifty documents created by himself and others.

Agent English stated that ultimately, he decided not to pursue the Defendant's involvement in the other related case. He said he had hoped to use the Defendant as an informant but decided that was not feasible and, instead, to pursue the offenses arising out of the

deer decoy operation. He said about a year after the deer decoy operation, he began assembling the reports. On September 17, 2014, he wrote the case report in this case, after reviewing his notes and the video recordings and conducting telephone interviews of three TWRA officers.

Agent English said he did not remember picking up the firearm at issue in this case. He said he emailed TWRA Sergeant Ben Davis and asked to take the firearm into ATF custody. He said that the rifle was transferred to federal custody in February 2014.

Agent English said he was transferred off the Defendant's case and that he did not know what happened to the case file afterward. He said he had searched the electronic files and the hardcopy files in Knoxville for the missing statements of TWRA officers. He said he also searched all of the files he took with him from Knoxville to his new assignment. He said he searched the ATF computer server and located only two emails related to this case. He said he did not have any email from TWRA Officer Pike or Sergeant Davis with a statement attached. He said that he had no personal memory of the TWRA officer statements. He stated that he did not destroy or intentionally get rid of the TWRA officer statements.

Agent English testified that he currently works in the Nashville division of the ATF. He stated that he had been disciplined with regard to his performance of his ATF duties. He said the ATF had seized a rifle, which he suspected could function as a machine gun. He said he test fired the rifle but was not able to get it to function as a fully automatic weapon. He said he removed an obstruction to the bolt and test fired the gun. He said this was in violation of ATF policy. He said that he self-reported this violation and that the gun was not used as evidence in a case. Agent English stated that he was also disciplined for mishandling evidence in ATF custody. He said on July 15, 2014, he took a gun into custody. After test firing the gun, he kept it in the trunk of his vehicle. ATF policy required him to put the gun into the vault, but there was

not a case open on this gun. He said he also self-reported this violation. He said he was disciplined by ATF for both of these violations, but neither resulted in a finding of untruthfulness.

With regard to the instant case, Agent English said he believed he may have asked the TWRA officers to write a narrative statement but that he generally did not do that in a gun case. He said he is aware that a statement from TWRA Officer Kip Kite was found in the file, but he did not know how it got there.

On cross-examination, Agent English testified that he had no recollection of when he was notified about the Defendant's TWRA violation or who called him. He said he knew that the Monroe County Sheriff's Office was involved in another aspect of investigating the Defendant. He said he had no explanation for the TWRA officers' testimony that he had asked them to prepare statements. He said he did not recall asking for or receiving their statements. He said he does not normally ask for statements from local officers. He said he interviewed the TWRA officers before writing his report in this case and that he would not have re-plowed that ground, if he already had statements from them. He acknowledged meeting with Sergeant Ben Davis multiple times to get evidence and the video recordings.

Agent English stated that the only copy of Officer Kite's statement was in the case file in the Knoxville Office. He said he did not know how Officer Kite's statement got in the file and that he was surprised to learn that Officer Kite said that he asked for it. He said he learned of the missing TWRA statements two months ago and that he searched all of his files from Knoxville for the statements. He said aside from the gun, he did not take any other evidence, including any ammunition, into custody in this case. He said he was aware that the Defendant was charged with possession of ammunition in the original Indictment. He said he

27

did not recall receiving any ammunition in this case. He stated that when he seizes a gun with ammunition, he typically recommends only charging the gun.

Agent English acknowledged that he was disciplined for altering a gun in his custody. He said the gun was being returned to the person from whom it was seized and that he would not return it, if it was a machine gun, in order to protect the public. He said he removed screws on the gun and added a washer, which provided a millimeter of space to allow the bolt to travel freely.

Special ATF Agent James Freeman testified that he has been a criminal investigator for the ATF for three years. He stated that he worked in the Knoxville office of the ATF from July 2014 to March 2015. In November 2014, he was assigned the Cline case, taking over from Agent Marty England. Agent Freeman said the investigation of Cline was related to the investigation of a larger conspiracy, which had a thick file. He said he created a separate file for Cline's offense arising out of the TWRA stop. Thus, he said the ATF had two separate files on Defendant Cline. He was not sure if Agent English had created a narrative report for Defendant Cline's TWRA violation. He said that he created a narrative report, also called a "blue jacket" for the prosecution of Defendant Cline. He said that he reviewed the Cline case file created by Agent English and that he did not recall seeing narrative statements in that file. He agreed that Officer Kip Kite's statement was ultimately located in that file, but he said he did not recall seeing it during his initial review.

Agent Freeman said in November 2014, he interviewed the TWRA officers involved in the Cline case. He was aware that Agent English had already talked to them. He asked the TWRA officers for a firsthand account of the hunting violation and complete details of what occurred on November 28, 2013. He said that he wrote a report based upon what they said.

28

He did not ask the TWRA officers to prepare written narrative statements. He did not recall whether the TWRA officers told him they had prepared narrative statements for Agent English, but he did not think that they did. Agent Freeman said he did not destroy or knowingly lose any statements relating to the Cline case.

On cross-examination, Agent Freeman testified that he was assigned to the Cline case one year after the incident. He said the Cline file created by Agent English already existed at the time he was assigned to the case. He said he put his report together from the existing file and his own investigation. He stated that he apparently found Officer Kip Kite's statement in his review of the existing file because he had a copy in the new file he created as well. He stated that he searched the files for the TWRA narrative statements a couple of months ago.

At the October 19 hearing, the Government recalled TWRA Wildlife Officer Kip Kite. Officer Kite testified that he placed the decoy deer in the deer decoy operation in November 2013. Officer Kite stated that he had previously received complaints of roadside hunting on Mannis Road. He said he was driving on Mannis Road one day when a landowner flagged him down and told him about a couple of dead deer in his field. He also said he may have received a second complaint by telephone. Based upon these complaints, he scouted a location on Mannis Road where he could locate a deer decoy operation. Officer Kite said, in choosing a location for the decoy deer, he looked for a spot that was more secluded and did not have houses around. He said that type of location would be safe for people and would make it more likely that deer would be found there. Officer Kite said he talked with Sondra Strickland about placing a decoy deer on her property. He said Ms. Strickland had called TWRA to complain about poachers and had spoken with him or Officer Pike.

Officer Kite said he recently returned to the location where he had placed the decoy deer on November 28, 2013, and the location was on Ms. Strickland's property. He said a new set of survey markers were on the property at that time. He stated that he definitely had to cross another landowner's land to get to Ms. Strickland's property. He said there was no residence on the land he crossed and that Ms. Strickland lives in Murfreesboro. Officer Kite said that TWRA officers are authorized by Tennessee statute to go on any land in Tennessee, including private property. He said that he could have located the deer decoy operation anywhere but that he typically sought permission for locating a deer decoy operation on private property.

Officer Kite stated that he created his statement of the events of November 28, 2013, at home on his personal computer. He said he created it on December 5 or 10, 2013. He said he did not email the statement but, instead, printed it out and gave it to Sergeant Ben Davis, who gave it to Marty English.

On cross-examination, Officer Kite testified that he located the spot at which he placed the decoy deer sometime in the week or month before November 28, 2013. He said he had no record of the complaints of illegal hunting on Mannis Road. He said he could not recall speaking with Ms. Strickland because it was three years ago. He acknowledged that the driveway and gate were not on Ms. Strickland's property. He said that the shooter was not on Ms. Strickland's property, unless she has an easement. He said a road on the other side of that gate leads to other properties. He said that he can go on any public or private land to enforce wildlife laws without restriction but that he customarily asks before locating a "sting" on someone's property in order not to impose on anyone. He admitted that he did not survey the property.

## III.    FINDINGS OF FACT

Based upon the testimony and exhibits presented in this case, the Court makes the following findings of fact:

In the month or weeks leading up to Thanksgiving 2013, TWRA wildlife officers received several complaints of illegal hunting from landowners on Mannis Road in Monroe County, Tennessee.  Specifically, they received complaints of individuals hunting from the road.  Wildlife Officers Kip Kite and Joe Pike decided to conduct a deer decoy operation on Thanksgiving Day, which is a popular day to hunt, in order to catch the individuals hunting from the road.  In preparation for the deer decoy operation, Officers Kite and Pike scouted a location on Mannis Road that was located away from houses and contained a field and brush on the edge of woods, which is an environment where deer are likely to be found.  Officer Kite contacted Ms. Sondra Strickland, who owned the property upon which he sought to locate the decoy deer.  Ms. Strickland, who had inherited the property on Mannis Road and who lived in Murfreesboro, had complained of people hunting on her property and agreed to the request.  Unbeknownst to Officer Kite, Ms. Strickland's property abutted the property of Mr. John Ruggiero, who owned the field between Mannis Road and the site where the decoy deer was placed.  Mr. Ruggiero's field contained a driveway with a gate   The TWRA officers did not contact Mr. Ruggiero about the placement of a decoy deer.

On the morning of November 28, Thanksgiving Day, 2013, Officer Kip Kite placed the decoy deer in the brush at the edge of a field on Mannis Road.  The decoy deer could be seen by persons driving north on Mannis Road but not by those driving south.  Officer Kite and Officer Lee hid on an embankment eight to ten feet from the road to observe and record any violators.

Officer Pike was stationed in a vehicle on one end of Mannis Road, and Sergeant Ben Davis and Officer Gray waited in their vehicle on the other end of Mannis Road. The officers in vehicles were responsible for stopping violators fleeing the scene of the decoy deer.

Between 9:45 a.m. and 10:00 a.m., an individual wearing camouflage and driving a silver minivan traveled past the location of the deer decoy and continued north on Mannis Road, without stopping or braking. Approximately thirty minutes later, William Frank, driving a purple Toyota pickup truck and traveling south on Mannis road, pulled into the driveway across from the decoy and stopped in front of the gate. Within thirty seconds, the Defendant, driving a silver minivan and also traveling south on Mannis Road, pulled onto the side of the road, blocking in the truck. Frank got out of the truck and shot in the direction of the decoy. **The Court finds that the Defendant did not fire a shot at the decoy deer.** Frank then jumped back in his truck. The Defendant drove the minivan forward a short distance to allow Frank to back the truck out of the driveway. Frank paused briefly beside the Defendant's minivan, before driving south on Mannis Road. The Defendant then drove south on Mannis Road, following the truck.

Officer Kite radioed that the driver of the truck had shot at the decoy and that the truck and minivan were fleeing in Officer Pike's his direction. Officer Kite directed the other officers to stop both vehicles because they were working together.

Officer Pike activated his siren and blue lights and stopped the truck at the top of a hill. The minivan, driven by Defendant Cline, then began backing rapidly down the hill. Sergeant Davis, also traveling south on Mannis Road, saw the minivan backing down the hill and activated his lights and siren. The Defendant, who appeared to be leaning toward the center of

32

the van, backed into a driveway and stopped. Sergeant Davis got out, walked toward the Defendant, and twice ordered him to raise his hands. The Defendant complied, after the second command. Sergeant Davis removed the Defendant from the minivan and frisked him. While frisking the Defendant, Sergeant Davis looked through the side window and saw the muzzle of a rifle, which was partially covered by a camouflage jacket, protruding from between the driver's and passenger's seats. Sergeant Davis removed a .270 round from the Defendant's front pants pocket and placed it on the driver's seat. Sergeant Davis then leaned into the van, removed the rifle, unloaded three .270 rounds from the rifle, and placed the rifle in his vehicle. The Court finds that Sergeant Davis took the rifle out of the minivan because he believed it was associated with deer hunting, which was the crime he was investigating. However, the Court also finds that Officer Kite radioed Sergeant Davis and Officer Pike that the shooter was in the truck and that Sergeant Davis admitted that Officer Kite did not tell him that the driver of the minivan had shot at the decoy, had a weapon, or had done anything other than be present at the scene.

Sergeant Davis asked the Defendant to identify himself and what he was doing. The Defendant said the rifle did not belong to him, but instead belonged to Donna Frank. The Defendant told Sergeant Davis that he had been hunting with a muzzleloader earlier that day, but had taken the muzzleloader home. A records check of the van's license tag revealed that the van was registered to Donna Frank. Officer Pike wrote citations for both the Defendant and the driver of the truck for illegal hunting, and they were permitted to leave.

In the week following November 28, 2013, Special ATF Agent Lamar "Marty" English, who was investigating the Defendant for an unrelated matter, learned of the hunting citation and asked Sergeant Davis and Officers Kite and Pike to prepare statements detailing their

involvement in the stop of the Defendant and seizure of the rifle. The three TWRA officers created these statements on computers, printed them without saving them, and then delivered them to Agent English either directly or through Sergeant Davis. None of the three TWRA officers retained a copy of his statement. After the statements were created and printed, the TWRA replaced the officers' computers without transferring any data from the old computers. In the spring of 2016, while preparing for trial, the TWRA officers told the prosecutor about the written statements. A search of computer and paper ATF files revealed only the statement of Officer Kite in the paper file in the Knoxville ATF office. ATF Agents English, John Freeman, and Jason Dobbs, the three ATF agents who were assigned to this case, all testified that they did not destroy or intentionally lose the statements of Officer Pike and Sergeant Davis.

## IV.     ANALYSIS

Defendant Cline asks the Court to suppress a firearm seized from his vehicle on November 28, 2013, and any statements that he made at the scene because this evidence was gained in violation of his Fourth Amendment rights. He also asks the Court to dismiss the Superseding Indictment in this case because the loss of two TWRA officer statements violates his right to due process of law under the Fifth and Fourteenth Amendments. The Court addresses each of these arguments in turn.

### A. November 28, 2013 Stop and Seizure

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. On November 28, 2013, TWRA Sergeant Ben Davis stopped Defendant, who

was driving a silver minivan; remove him from the van; frisked him; seized a hunting rifle from inside his van; and questioned him without advising him of the <u>Miranda</u> warnings. The Defendant argues the stop, frisk, seizure, and unwarned interrogation violated his Fourth Amendment right to be free of unreasonable searches and seizures. He also contends that the Court should employ the exclusionary rule to suppress all evidence resulting from his encounter with Sergeant Davis on November 28, 2013, including his statements, which he claims are fruit of the poisonous tree.

### *(1) Propriety of Stop of Defendant*

The Defendant argues that Sergeant Davis did not have reasonable suspicion that he was involved in a crime in order to stop him on November 28, 2013. He contends that nothing about his behavior on November 28, 2013, indicated that he was acting in concert with the driver of the truck. Instead, the Defendant asserts that TWRA officers were acting on a mere hunch that he was involved because he was in the same vicinity as the driver of the truck. The Government responds that Sergeant Davis had reasonable suspicion that the Defendant was assisting the driver of the truck, who was hunting illegally. Alternatively, the Government contends that Sergeant Davis properly stopped the Defendant because he observed the Defendant committing a traffic violation.

"[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." <u>United States v. Martin</u>, 289 F.3d 392, 396 (6th Cir. 2002) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968)) (other citations omitted). Assessing whether an investigatory stop comports with the Fourth

Amendment is a two-step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. Id.

A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion. United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397.

Examining the totality of the circumstances in the instant case, the Court finds that Sergeant Davis had reasonable suspicion to stop the Defendant to investigate his participation in illegal hunting. Officer Kite saw the truck driven by the shooter drive directly to and pull into the driveway near the deer decoy, despite the fact that the decoy deer could not be seen by vehicles traveling from that direction. The Defendant drove up in silver minivan approximately

thirty seconds later and stopped on Mannis Road by the truck. There was no reason apparent to the officers, other than a connection to the truck, for the Defendant to stop there. The fact that the Defendant blocked the truck from backing out of the driveway suggested that the drivers of the two vehicles were together and intended to leave at the same time. Additionally, Officer Kite had seen a silver minivan, like that driven by the Defendant, drive past the decoy from the south toward the north (the direction from which the decoy was visible from the road) thirty minutes earlier. Officer Kite observed the Defendant looking on, while the driver of the truck shot at the decoy; and then, the Defendant pulled forward to allow the truck to back out of the driveway but did not drive away. Instead, it appeared to Officer Kite that the drivers of the truck and minivan were signaling to each other. When the truck drove away, the minivan immediately followed. These circumstances considered together gave Officer Kite a reasonable suspicion that the Defendant was assisting the driver of the truck with hunting illegally.

Officer Kite radioed to Officer Pike and Sergeant Davis to stop the truck and the minivan because they were together. A police officer may rely upon information supplied by another officer or law enforcement agency to provide reasonable suspicion to stop an individual. United States v. Lyons, 687 F.3d 754, 765-66 (6th Cir. 2012); see also United States v. Hensley, 469 U.S. 221, 232 (1985) (holding that officers conducting Terry stop could rely upon flyer issued by another police department, when the issuing officers had reasonable suspicion and an objective reading of the flyer would have allowed an experienced officer to believe the defendant was wanted for further investigation). "'[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.'" United States v. Barnes, 910 F.2d 1342,

1344 (6th Cir. 1990) (quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976)). "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." Lyons, 687 F.3d at 766. Here, Sergeant Davis was working with Officer Kite in the deer decoy operation and stopped the Defendant at the direction of Officer Kite.

Additionally, when Sergeant Davis encountered the Defendant's minivan, it was backing rapidly away from where Officer Pike had stopped the truck at the top of the hill. The Defendant's apparent attempt to flee from the police, rather than waiting until Officer Pike permitted him to drive past, gave Sergeant Pike additional reason to suspect that the Defendant was involved in illegal hunting with the driver of the truck. Although flight at the sight of police cannot alone justify a Terry stop, it can contribute to a finding of reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

In arguing that his behavior on November 28, 2013, was innocent, the Defendant points the Court to United States v. Whitmore, 314 F. Supp. 2d 690 (E.D. Mich. 2004). There, the court held that the defendant had not committed public indecency by urinating in a national forest and that the defendant's behavior did not otherwise give the officer reasonable suspicion to stop him. Id. at 698-99. In the instant case, Officer Kite suspected the Defendant of assisting with illegal hunting. Tennessee law provides that "[i]t is unlawful for any person to hunt, take, chase, trap or kill any wild animal, wild bird, wild fowl or fish, upon the land of another without having first obtained the permission or approval of the owners of the land, or of the person or persons in charge of the land and having authority from the owner to give such permission."

38

Tenn. Code Ann. § 70-4-106. "Hunting" is defined as "chasing, driving, flushing, attracting, pursuing, worrying, following after or on the trail of, *searching for*, trapping, shooting at, stalking, or lying in wait for, any wildlife, whether or not such wildlife is then or subsequently captured, killed, taken, or wounded and *every act of assistance to any other person*, but 'hunting' does not include stalking, attracting, searching for, or lying in wait for, wildlife by an unarmed person solely for the purpose of watching wildlife or taking pictures of wildlife[.]" Tenn Code Ann. § 70-1-101(a)(19) (emphasis added). While the officer in <u>Whitmore</u> could not reasonably suspect the defendant of public indecency in an area that was secluded, it is reasonable for Officer Kite to suspect that the Defendant was assisting the driver of the truck in hunting without permission by directing him to the location of the decoy deer. The instant case does not suffer from the flaw in <u>Whitmore</u>, a case in which the defendant's conduct did not fall within the statute.

The Defendant also argues that simply being present in an area where a crime is being committed does not alone justify an investigatory stop. He compares his behavior on the day in question to that of "an innocent passer-by who stopped to watch the curious conduct of another[.]" [Doc. 42, p. 7] However, as discussed above, the Defendant's behavior (parking so as to block the truck, pulling forward to allow the truck to back out, and communicating with the driver of the truck with hand signals) suggested that he stopped there to assist the driver of the truck, rather than merely to watch. The Court finds that Sergeant Davis could stop the Defendant and initially ask him questions to either confirm or dispel his suspicion that the Defendant was engaged in hunting without permission.

39

The Government also argues that Sergeant Davis had probable cause to stop the Defendant for a traffic violation committed in his presence. It argues that when Officer Pike attempted to stop the truck driven by Frank and the Defendant by intercepting them on Mannis Road with his lights and siren activated, the Defendant placed his minivan in reverse and accelerated backward approximately one hundred yards. It maintains that Sergeant Davis, approaching from the other direction with lights and siren activated, blocked the Defendant's flight. Thus, the Government contends that Sergeant Davis had probable cause to stop the Defendant for driving recklessly in an attempt to evade a police officer. Tennessee law provides that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control or regulate traffic." Tenn. Code Ann. § 55-8-104(a). Additionally, it is a violation of Tennessee law to "drive[] any vehicle in willful or wanton disregard for the safety of persons or property." Tenn. Code Ann. § 55-10-205(a) (proscribing reckless driving). Officer Kite radioed Officer Pike and Sergeant Davis to stop both the truck and the minivan. Sergeant Davis came upon the Defendant rapidly backing away from Officer Pike. At that point, Sergeant Davis had probable cause to stop the Defendant for driving recklessly while attempting to evade being stopped by Officer Pike.

Having found the fact of the stop of the Defendant did not violate the Fourth Amendment, the Court next examines whether the intrusiveness of the stop was reasonably related to the presenting circumstances. See Caruthers, 458 F.3d at 464. The Defendant argues that Sergeant Davis's frisk of his person violated the Fourth Amendment. An officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing the suspect was "armed and dangerous." Terry, 392 U.S. at 27; Smith, 594 F.3d at 542. "Before [an officer] places a hand on the person of a

40

citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968). The Defendant argues that the officers lacked any reasonable basis to believe that he was armed or dangerous.

In the instant case, Sergeant Davis testified that it is common for all individuals involved in illegal hunting to be armed. Officer Kite testified that Thanksgiving Day is a popular day to hunt. Sergeant Davis also testified that the Defendant was dressed in hunting attire, including wearing blaze orange near his neck. More importantly, the Defendant appeared to be intent on fleeing the police, as evidenced by his backing down the hill rapidly toward Sergeant Davis's vehicle and the Defendant's failure to raise his arms on the first direction to do so. Given the nature of the crime being investigated (illegal hunting), the Defendant's hunting attire, and the Defendant's actions indicating flight immediately before his apprehension, the Court finds that Sergeant Davis observed particular facts that allowed him to reasonably infer that the Defendant could be armed and dangerous. Accordingly, Sergeant Davis could properly frisk the Defendant for weapons. While frisking the Defendant, Sergeant Davis saw a rifle in his van. The Court next examines whether Sergeant Davis could properly seize the rifle pursuant to the plain view exception to the warrant requirement.

### (2) Propriety of Seizure of Firearm

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be

seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)). The Defendant's argument centers on the third requirement, whether Sergeant Davis was lawfully standing beside his van in order to view the rifle through the window. His main contention in this regard is that the stop was unlawful. For the reasons discussed above, the Court has concluded that the stop was not unlawful as Sergeant Davis had reasonable suspicion to conduct an investigatory stop of the Defendant. The Defendant also argues that Sergeant Davis was not lawfully standing beside his van because the deer decoy operation was unlawful from its inception. He argues that the TWRA did not have permission from the landowner Mr. Ruggiero to conduct a deer decoy operation that involved his property. He contends that the officers had to walk over Mr. Ruggiero's property to place the decoy deer and that anyone shooting at the decoy had to fire over Mr. Ruggiero's property. Thus, he contends that the officer cannot receive the benefit of the plain view exception in this case.

The Court finds no constitutional taint stemming from the manner in which the TWRA conducted the deer decoy operation in this case. First, the Court observes that, unlike sobriety checkpoints, the deer decoy operation in the instant case did not involve an intrusion into the rights of everyone driving past. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 451 (1990). Instead, only individuals involved in illegal hunting were stopped, and the officers had to have reasonable suspicion, as discussed above, to stop those individuals. Second, the Court finds that the Defendant's argument is factually incorrect because Officer Kite sought and gained permission from Ms. Strickland, the owner of the land on which the decoy deer was placed.[7]

_____

[7] The Court observes that the deed presented by Mr. Ruggerio states that his property is subject to "a 20-foot right of way easement for ingress and egress to the lands of Bee Strickland as

Third, and most importantly, whether the officers trespassed on Mr. Ruggiero's property does not change the fact that they have the authority to stop and give citations to persons illegally hunting. In other words, the Defendant has no standing to assert Mr. Ruggiero's Fourth Amendment rights.

However, while the Court finds that Sergeant Davis, who was standing outside the Defendant's minivan, was properly at the location from which he viewed the rifle, it also finds that the plain view exception does not permit the seizure of the rifle because the character of the rifle was not immediately incriminating. "Once we have established that the officers were lawfully present, the next prong of the 'plain view' doctrine requires that the criminality of the articles before the officers be 'immediately apparent.'" United States v. McLevain, 310 F.3d 434, 440 (6th Cir. 2002) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)).

> [T]he Supreme Court does not require that officers know that evidence is contraband. Instead, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." Texas v. Brown, 460 U.S. 730, 742, . . . (1983).

McLevain, 310 F.3d at 441.

Determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" United States v.

---

shown on the above said plaits." [Exh. 5] Officer Kite testified that on the other side of the gate from the driveway on the property in question, was a road that allowed access to other landowners' property. Thus, the Court infers that Ms. Strickland could have granted the officers permission to cross the easement to place the decoy on her property.

43

Calloway, 116 F.3d 1129, 1133 (6th Cir.) (quoting Texas v. Brown, 460 U.S. 730, 741-42 (1983) & Payton v. New York, 445 U.S. 573, 587 (1980) (emphasis omitted)), cert. denied 522 U.S. 925 (1997).  The following factors, none being alone determinative, guide the assessment of whether the incriminating character of an item was immediately apparent:

> (1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions.

Id. (citing United States v. Beal, 810 F.2d 574, 576 77 (6th Cir. 1987)).

In the instant case, the Government argues that a hunting rifle is useful as evidence of a hunting violation.  However, examination of the first factor above belies the inevitability of this assertion.  Officer Kite radioed to Sergeant Davis that the driver of the truck (Frank) was the individual who shot at the decoy, not the driver of the minivan (the Defendant).  Accordingly, Sergeant Davis knew that the rifle in the Defendant's van was not the rifle used to shoot at the decoy.  In other words, Sergeant Davis knew there was no nexus between the rifle in the Defendant's van and the hunting violation that led to the stop of the Defendant.

The cases cited by the Government do not have this nexus problem and, thus, are distinguishable from the instant case, because either the defendants in those cases used the firearm (or other seized item) in the crime under investigation or the seizing officer could reasonably infer that they did.  See United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998) (holding that although ammunition and guns are not inherently unlawful to possess, they may be seized pursuant to the plain view exception because they "assume[ed]  an incriminating or suspicious nature in connection with the crime under investigation," which was hunting out of

44

season); State v. Henry, 802 S.W.2d 448, 450 (Ark. 1991) (holding "the wildlife officers witnessed a hunting violation [hunting out of season] by the respondent, and the rifle and hunting jacket, in obvious view in respondent's truck, were connected with the offense with which respondent was arrested and charged"); see also United States v. Whitley, 680 F.3d 1227, 1235 (10th Cir. 2012) (observing that information that the defendant was a convicted felon, a tip that a gun and spent ammunition was seen in the defendant's car, and a tip that defendant was seen loading a dead antelope into his truck on the first day of hunting season provided reasonable suspicion that defendant was a felon in possession of a firearm). Here, Sergeant Davis knew that the Defendant did not use the rifle in his van in the illegal hunting observed by Officer Kite.

The second factor, "whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity," leads to a similar conclusion. See Calloway, 116 F.3d at 1133. Nothing about the nature or appearance of the rifle caused Sergeant Davis to associate it with the hunting violation that had just occurred. First, hunting rifles are not inherently illegal to possess. Moreover, there is no evidence before the Court that the appearance of the rifle indicated that it had been used in the hunting violation. Instead, as stated above, Sergeant Davis knew this rifle was not the one used in the hunting violation under investigation.

Finally, Sergeant Davis did not instantaneously perceive that the rifle in the Defendant's van was evidence of the Defendant assisting the driver of the truck in committing a hunting violation. In the instant case, Sergeant Davis testified that it is common for hunters, including hunters working together, to be armed. However, the crime that Sergeant Davis was investigating was hunting without permission. The fact that the Defendant had a rifle in his van

45

might indicate he was a hunter but is not evidence that he was hunting without permission, nor evidence of any assistance to Frank. To say that all evidence that the Defendant is a hunter is also evidence that he was assisting Mr. Frank in hunting without permission sweeps too far. The Court finds that the seizure of the rifle does not come within the plain view exception because Sergeant Davis was not warranted in believing that it was useful as evidence of a crime.[8] The undersigned recommends that the rifle be suppressed.

### (3) Propriety of Statements by Defendant

After Sergeant Davis frisked the Defendant, removed his hunting rifle from his van, and secured the rifle in his TWRA vehicle, Sergeant Davis asked the Defendant what he was doing, his name, where he was from, whether he had identification, and to whom the van belonged.[9] Sergeant Davis stated he did not advise the Defendant of the Miranda warnings but, instead, asked the questions he typically asks when investigating a wildlife violation. Sergeant Davis testified that the Defendant said the rifle taken from the van was not his and that it belonged to Donna Frank. The Defendant also said he had been hunting with a muzzleloader earlier that morning but had returned the muzzleloader to his residence. The Defendant asks the Court to suppress his statements—particularly his statement about hunting with a muzzleloader—made during the stop because they were the fruit of the illegal stop and were unwarned. The Court

---

[8] The Government argues that Sergeant Davis properly seized the rifle pursuant to Tenn Code Ann. § 70-6-201, which authorizes a wildlife officer to "seize and take possession of any and all . . . guns . . . that have been used, transported, or possessed contrary to any laws or regulations promulgated by the fish and wildlife commission." This argument fails for the same reasons stated above, because Sergeant Davis knew that the rifle was not used in the illegal hunting violation.

[9] The Government states that Sergeant Davis also asked the Defendant whether there were any more firearms in the van. [Doc. 38, p.7] The Court heard no testimony on this inquiry or with regard to any statement that Defendant made in response.

quickly disposes of the first argument: The Court has found that Sergeant Davis properly stopped the Defendant. Thus, the statements are not the fruit of an unconstitutional stop.

The Defendant maintains that once Sergeant Davis stopped him, he was in police custody because he was no longer free to leave. He contends that Sergeant Davis violated the Fifth Amendment by questioning him while he was in police custody without first advising him of the Miranda warnings. The Government argues that the Defendant was not in custody but, instead, was merely subject to an investigatory detention and detained while the wildlife officer wrote out a citation for a misdemeanor hunting violation. Thus, it argues that the advice of rights was not necessary.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948. The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). In the instant case, the parties agree that Sergeant Davis questioned the Defendant and that no Miranda warnings were administered. The question is whether the Defendant was in custody for purposes of the Fifth Amendment.

47

To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); Swanson, 341 F.3d at 529.

Our Supreme Court has held that the roadside detention of a motorist for a routine traffic stop is not police custody requiring the Miranda warnings. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). To be sure, individuals detained for a traffic violation are not free to leave until the officer issues a citation and concludes the stop. Id. at 436. However, the nature of a traffic stops—that they are temporary and brief and that they occur in public, rather than in a "police-dominated" atmosphere—"mitigates the danger that the person questioned will be induced 'to speak where he would not otherwise do so freely[.]'" Id. at 437-38 (quoting Miranda, 384 U.S. at 467). The Court likens traffic stops to investigatory or Terry stops, in which "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Id. at 440. "The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda." Id. However, "[i]f a motorist

48

who has been detained pursuant to a traffic stop [or a Terry stop] thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by <u>Miranda</u>." <u>Id.</u>

In the instant case, the Defendant was detained pursuant either to a <u>Terry</u> stop to investigate his participation in the illegal hunting violation or for traffic offenses or both. Moreover, nothing about the stop converted it to a "custodial detention."[10] The stop was not prolonged. Although the Defendant was frisked, he was not handcuffed or otherwise restrained. The questioning took place beside the Defendant's van. The questions related to the Defendant's identity or the hunting violation. Finally, once Officer Pike wrote the citation for the hunting violation, the Defendant was allowed to leave. The Court finds that the Defendant was not in custody such that the <u>Miranda</u> warnings were required. Accordingly, the undersigned discerns no reason to suppress the Defendant's statements made at the scene of the stop.

*(4) Good Faith Exception*

The Defendant argues that the Court should apply the exclusionary rule to suppress the firearm in this case. He argues that the way in which law enforcement obtained the evidence reveals that they were not acting in good faith. Specifically, he contends that the TWRA officers deployed the decoy deer without permission of the landowner, law enforcement has destroyed or lost physical evidence in this case, law enforcement has destroyed or lost official records of the search and seizure, and ATF agents waited a year to pursue prosecution of the case. The

---

[10] The Court notes that during cross-examination, Sergeant Davis opined that the Defendant was in "custodial interrogation." [Tr. at 149] The Court deems this to be an erroneous legal conclusion for the reasons discussed above.

Defendant asserts that the good faith exception to the exclusionary rule does not apply when the conduct of the officers is at issue.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusionary rule is not applied automatically upon a finding of a Fourth Amendment violation. See Herring v. United States, 555 U.S. 135, 140 (2009). Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 555 U.S. at 141 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Herring, 555 U.S. at 141 (quoting Illinois v. Krull, 480 U.S. 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

In Herring, the Court declined to apply the exclusionary rule to a Fourth Amendment violation stemming from the negligence of police personnel in failing to remove a withdrawn

arrest warrant from the computer, finding that an "error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place." <u>Id.</u> at 144. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." <u>Id.</u> In other words, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Id.</u>

In the instant case, Sergeant Davis testified that he seized the rifle from the Defendant's minivan because he believed it was associated with the hunting violation under investigation. However, he also testified that at the time he stopped the Defendant, he knew that the driver of the truck, not the driver of the minivan, had shot at the deer decoy and that no one had indicated to him that the driver of the minivan shot at the decoy or even had a weapon. The Court finds that Sergeant Davis seized the rifle based upon a mistaken belief that it was evidence of the hunting violation, even though he knew that the Defendant had not used it to shoot at the decoy. The Court finds that Sergeant Davis's warrantless seizure of the Defendant's rifle, while knowing it was not used in the illegal hunting violation, is precisely the kind of conduct the exclusionary rule was intended to deter. The Court concludes that the circumstances carved out by <u>Herring</u> do not apply in this case and that the exclusionary rule should be applied to suppress the rifle.

### B. Missing TWRA Statements

Pursuant to the constitutional guarantee of the due process of law under the Fifth and Fourteenth Amendments, the Defendant asks the Court to dismiss the Superseding Indictment,

because law enforcement lost or destroyed two witness statements[11] made close in time to the November 28, 2013 stop of his minivan and seizure of a rifle from within the van. He argues that these witness statements, created within a week of the alleged crime, would permit him to impeach Government witnesses and that he cannot obtain comparable evidence by reasonably available means. He argues that circumstantial evidence suggests bad faith on the part of the TWRA officers and ATF agents who lost or destroyed the statements.

The Government responds that the loss of Jencks Act materials is not a basis for the dismissal of charges. It argues that the two missing TWRA reports are neither exculpatory or impeaching evidence but, instead, were created to assist with the prosecution of the case. Alternatively, the Government contends that even if the statements were considered to be potentially exculpatory, the Defendant cannot show bad faith. It also asserts that comparable evidence is available to the Defendant because both TWRA officers are available to testify.

Exculpatory evidence is that which is "favorable" to the defendant, Brady, 373 U.S. at 87, or permits the defendant to impeach a government witness, United States v. Bagley, 473 U.S. 667, 676 (1985). Although illusive of precise definition, exculpatory evidence "may make the difference between conviction and acquittal." Id. The Supreme Court has also recognized that due process may require the disclosure of evidence that is potentially exculpatory, i.e.,

---

[11] The Defendant also argues that the loss of ammunition seized at the time of the stop should result in the dismissal of the Superseding Indictment. As discussed above, the Court finds no evidence that the ammunition, with which the Defendant is no longer charged, has been lost. The Government states that it was never seized. Sergeant Davis testified that he placed the round of ammunition seized from the Defendant's pocket on the front seat of the Defendant's minivan and that he removed three rounds from the rifle. He testified that he placed the rifle in his vehicle to secure it, but he did not say what he did with the ammunition removed from the rifle. Agent English testified that he did not recall taking custody of any ammunition in this case. Based on the paltry record before it, the Court cannot conclude the ammunition was ever seized or is missing.

"evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Arizona v. Youngblood, 488 U.S. 51, 57 (1988).

Not every failure to preserve exculpatory evidence will result in a denial of due process. The "duty [to preserve evidence] must be limited to evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488. Specifically, to trigger the duty to preserve evidence, the exculpatory value of the evidence must be apparent before its loss or destruction, and the defendant must be unable to get comparable evidence by other reasonably available means. Id. at 489. "The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith." United States v. Wright, 260 F.3d 568, 570 (6th Cir. 2001); see also Youngblood, 488 U.S. 51, 57 n.1 (observing that due process, "as interpreted in Brady, makes the good or bad faith of the [government or law enforcement] irrelevant when the [government] fails to disclose to the defendant material exculpatory evidence").

The Supreme Court created a different test with regard to potentially exculpatory evidence, which is evidence that might or might not show the defendant's innocence. Id. at 571. For the destruction of "potentially useful evidence" to violate due process,

> a defendant must show: (1) that the government acted in bad faith
> in failing to preserve the evidence; (2) that the exculpatory value of
> the evidence was apparent before its destruction; and (3) that the
> nature of the evidence was such that the defendant would be
> unable to obtain comparable evidence by other reasonably
> available means.

United States v. Jobson, 102 F.3d 214, 218 (6th Cir. 1996); see Youngblood, 488 U.S. at 57, 58; Trombetta, 467 U.S. at 488 89; see also Monzo v. Edwards, 281 F.3d 568, 580 (6th Cir. 2002); Wright, 260 F.3d at 571.

The Court turns first to the question of whether the witness statements of Sergeant Davis and Officer Pike constitute material, exculpatory evidence or potentially exculpatory evidence that may or may not have exonerated the Defendant. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682; see also Hamblin v. Mitchell, 354 F.3d 482, 495 (6th Cir. 2003). In contrast, potentially useful evidence is that evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57. The Supreme Court distinguished this type of evidence from that which is both exculpatory on its face and material to the defense because the Court recognized the inherent difficulty in "'divining the import of materials whose contents are unknown and, very often, disputed.'" Id. at 58 (quoting Trombetta, 467 U.S. at 486).

The Court finds that the statements of TWRA Wildlife Officers Davis and Pike in this case fall into the category of potential impeachment evidence. The Court finds it highly unlikely that the officers' accounts of stopping the Defendant, seizing a rifle from his minivan, and writing him a citation for hunting without permission would have exonerated the Defendant. These statements were requested by the ATF to aid in the future prosecution of the Defendant. However, the Court finds that the Defendant *may have been able* to use these statements to impeach portions of the officers' trial testimony, if their testimony varied in some respect from

their accounts in the statements. Thus, the Court concludes that the missing statements are potential impeachment evidence and, as such, are subject to the test established in Youngblood for potentially exculpatory evidence.

In order to show a due process violation through the loss of potentially exculpatory evidence, the Defendant must first show that the government acted in bad faith in failing to preserve the evidence. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed":

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

Youngblood, 488 U.S. at 58. Negligence or even gross negligence on the part of the government does not amount to bad faith. Jobson, 102 F.3d at 218.

Defendant Cline argues that the following constitutes circumstantial evidence of bad faith: (1) the ATF asked for the statements outside of the TWRA officer's normal duties; (2) the delay of one-year in bringing charges following the incident and the preparation of the statements; (3) the loss of the statements by two law enforcement agencies; (4) and the selective loss of the statements relating to the stop and seizure and not the statement from the officer at the

55

deer decoy site.[12]  The Court is not persuaded that any of these reasons, individually or viewed together, show bad faith.  First, the fact that the ATF agent asked the TWRA officers to prepare a statement describing their involvement in the stop of the Defendant would serve to document the events while they were fresh in the officers' minds.  The Court perceives nothing nefarious in such a request, even though the TWRA officers might not normally prepare a statement for their own use on a hunting violation.  With regard to the one-year delay between the stop of the Defendant and the Indictment, the Court observes that Agent English testified that he was investigating the Defendant's involvement in a conspiracy and hoped that the Defendant would work as an informant with regard to that case.  The primacy of the other investigation explains the delay in charging the Defendant with being a felon in possession and is another reason for asking the TWRA officers to prepare statements.

The Defendant argues that the loss of Sergeant Davis's and Officer Pike's statements by two different law enforcement agencies also indicates bad faith.  First, the Court finds that the TWRA did not lose or maliciously destroy the statements.  These statements were prepared for the ATF for use in the federal prosecution of the Defendant, not for use with regard to his hunting violation or in relation to state charges.  The officers testified that they were not required to keep the statements as a part of the TWRA case, which was largely concluded with the citation for the hunting violation.  As a result, none of the three TWRA officers saved an electronic copy or a hardcopy of their statement.  Officer Pike testified that he was a witness in the ATF's case against the Defendant, and he assumed that the ATF would retain a copy of his

---

[12] The Defendant also argues that the loss of the ammunition taken from his person and the rifle is circumstantial evidence of bad faith.  The Court has already found no proof that the ammunition was seized or lost.

statement.  Accordingly, the Court does not find fault with the TWRA officers for not retaining a copy of their statements.

The ATF agents, on the other hand, were required to keep copies of witness statements. According to the testimony of Agent Dobbs, Agent English should have both scanned the statements into the electronic file and placed the hardcopies in the paper file.  At the time that the Cline case was reassigned to Agent Freeman, approximately a year after the November 28, 2013 hunting violation and stop, only the statement of Officer Kite, and not the statements of Sergeant Davis and Officer Pike, were in the paper file.  Thus, the Court finds that the statements of Sergeant Davis and Officer Pike were lost on Agent English's watch.  However, Agent English testified that he did not destroy or intentionally lose the statements.  The Court has no evidence to the contrary.  Thus, the Court finds that the loss of the statements at some point during the time that Agent English was the case agent on the Cline case was due to negligence.

Finally, the Defendant argues that the loss of the statements of Sergeant Davis and Officer Pike, who participated in the stop and seizure, but not the statement of Officer Kite, who was stationed at the location of the deer decoy, indicates law enforcement selectively destroyed the former.  The Court does not draw such a conclusion.  Instead, the Court observes that video footage exists of both the activity by the deer decoy and the stop of the Defendant by Sergeant Davis.  Thus, the loss of the statements does not permit the stopping officers to alter their testimony, because the accuracy of their testimony can still be tested on cross-examination with the aid of the video footage.  Accordingly, the Court attributes the ATF's loss of the statements of Sergeant Davis and Officer Pike to negligence, and not to bad faith.

The Court also finds that the Defendant cannot show the other two prongs of the Youngblood test are met in this case. He argues that the exculpatory value of the evidence was apparent before its destruction because the statements were made within a week of the stop. The Government asserts that the statements had no exculpatory value but, instead, were inculpatory. The Court has already observed that the value of the statements lies only in their potential for use in impeaching the TWRA officers, if they testify in contradiction with the statement, not in their ability to exonerate the Defendant. Finally, the Defendant argues that these statements are the only witness statements from near in time to the stop and, thus, he does not have other comparable evidence. However, as discussed above, video recordings of both the Defendant's actions at the location of the deer decoy and of the stop by Sergeant Davis exist in this case. These video recordings occurred simultaneously with the events and constitute comparable, if not superior, evidence with which the Defendant can cross-examine the officers.

The Defendant argues that the loss of witness statements can be a basis for the dismissal of the indictment. The Court finds that, even if dismissal of the indictment is a possible remedy, the Defendant still must show bad faith and the absence of other comparable evidence, because the statements are only potentially useful for impeachment,. The Defendant has shown neither with regard to the missing statements of Sergeant Davis and Officer Pike. Accordingly, the Court finds that the loss of Sergeant Davis's and Officer Pike's narrative statements regarding the stop and citation of the Defendant on November 28, 2013, does not amount to a due process violation in this case. The Court recommends that the Defendant's request to dismiss the Superseding Indictment be denied.

## V.     CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds that the TWRA Wildlife Officer had reasonable suspicion to conduct an investigatory stop of the Defendant on November 28, 2013.  The officer also had probable cause to stop the Defendant for traffic offenses.  However, the Court finds that the officer's warrantless seizure of a firearm from the Defendant's minivan did not fall within the plain view exception because the firearm was not immediately recognizable as contraband or evidence of a crime.  The Court also finds no basis to dismiss the Superseding Indictment because the Defendant has not shown that either the TWRA or the ATF acted in bad faith in losing the statements of Wildlife Officers Davis and Pike, nor has the Defendant shown the absence of other comparable evidence.  Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress [**Doc. 35**] and Amended Motion to Suppress [**Doc. 59**] be **granted in part** in that the firearm seized from the Defendant's van on November 28, 2013,

should be suppressed.  The undersigned also **RECOMMENDS** that the Defendant's Motion to Dismiss Indictment for the Violation of Defendant's Fifth and Fourteenth Amendment Right to Due Process [**Doc. 43**] be **denied**.[13]

Respectfully submitted,

_____s/ C. Clifford Shirley, Jr._
United States Magistrate Judge

---

[13] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).