UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:14-CR-160-TAV-CCS |
| | ) | |
| RICKY WILLIAM CLINE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This criminal action is before the Court on the Report and Recommendation of

Magistrate Judge C. Clifford Shirley, Jr., entered on December 14, 2016 [Doc. 67] (the

"R&R"), which addresses the defendant's motions to suppress [Docs. 35, 59] and motion to

dismiss the superseding indictment [Doc. 43].   After consideration of the defendant's

motions, Judge Shirley recommends that the defendant's motions to suppress [Docs. 35, 59]

be granted in part and denied in part, in that the firearm seized from the defendant's van

should be suppressed.  Judge Shirley also recommends that the defendant's motion to dismiss

the indictment [Doc. 43] be denied.  The defendant filed an objection to the R&R [Doc. 68].

The government also filed an objection [Doc. 70], to which the defendant responded [Doc.

71].

I.      **Background**

The Court presumes familiarity with the R&R in this case, but for purposes of

background, includes the following findings of fact as articulated in the R&R:[1]

---

[1] The Court notes that the defendant objected to certain portion of the R&R's findings of
fact, including the characterization of certain facts and the exclusion of certain facts.  The Court
will address those objections in its analysis.

In the month or weeks leading up to Thanksgiving 2013, [Tennessee Wildlife Resources Agency ("TWRA")] wildlife officers received several complaints of illegal hunting from landowners on Mannis Road in Monroe County, Tennessee. Specifically, they received complaints of individuals hunting from the road. Wildlife Officers Kip Kite and Joe Pike decided to conduct a deer decoy operation on Thanksgiving Day, which is a popular day to hunt, in order to catch the individuals hunting from the road. In preparation for the deer decoy operation, Officers Kite and Pike scouted a location on Mannis Road that was located away from houses and contained a field and brush on the edge of woods, which is an environment where deer are likely to be found. Officer Kite contacted Ms. Sondra Strickland, who owned the property upon which he sought to locate the decoy deer. Ms. Strickland, who had inherited the property on Mannis Road and who lived in Murfreesboro, had complained of people hunting on her property and agreed to the request. Unbeknownst to Officer Kite, Ms. Strickland's property abutted the property of Mr. John Ruggiero, who owned the field between Mannis Road and the site where the decoy deer was placed. Mr. Ruggiero's field contained a driveway with a gate. The TWRA officers did not contact Mr. Ruggiero about the placement of a decoy deer.

On the morning of November 28, Thanksgiving Day, 2013, Officer Kip Kite placed the decoy deer in the brush at the edge of a field on Mannis Road. The decoy deer could be seen by persons driving north on Mannis Road but not by those driving south. Officer Kite and Officer Lee hid on an embankment eight to ten feet from the road to observe and record any violators. Officer Pike was stationed in a vehicle on one end of Mannis Road, and Sergeant Ben Davis and Officer Gray waited in their vehicle on the other end of Mannis Road. The officers in vehicles were responsible for stopping violators fleeing the scene of the decoy deer.

Between 9:45 a.m. and 10:00 a.m., an individual wearing camouflage and driving a silver minivan traveled past the location of the deer decoy and continued north on Mannis Road, without stopping or braking. Approximately thirty minutes later, William Frank, driving a purple Toyota pickup truck and traveling south on Mannis road, pulled into the driveway across from the decoy and stopped in front of the gate. Within thirty seconds, the Defendant, driving a silver minivan and also traveling south on Mannis Road, pulled onto the side of the road, blocking in the truck. Frank got out of the truck and shot in the direction of the decoy. **The Court finds that the Defendant did not fire a shot at the decoy deer.** Frank then jumped back in his truck. The Defendant drove the minivan forward a short distance to allow Frank to back the truck out of the driveway. Frank paused briefly beside the Defendant's minivan, before driving south on Mannis Road. The Defendant then drove south on Mannis Road, following the truck.

2

Officer Kite radioed that the driver of the truck had shot at the decoy and that the truck and minivan were fleeing in Officer Pike's his direction. Officer Kite directed the other officers to stop both vehicles because they were working together.

Officer Pike activated his siren and blue lights and stopped the truck at the top of a hill. The minivan, driven by Defendant Cline, then began backing rapidly down the hill. Sergeant Davis, also traveling south on Mannis Road, saw the minivan backing down the hill and activated his lights and siren. The Defendant, who appeared to be leaning toward the center of the van, backed into a driveway and stopped. Sergeant Davis got out, walked toward the Defendant, and twice ordered him to raise his hands. The Defendant complied, after the second command. Sergeant Davis removed the Defendant from the minivan and frisked him. While frisking the Defendant, Sergeant Davis looked through the side window and saw the muzzle of a rifle, which was partially covered by a camouflage jacket, protruding from between the driver's and passenger's seats. Sergeant Davis removed a .270 round from the Defendant's front pants pocket and placed it on the driver's seat. Sergeant Davis then leaned into the van, removed the rifle, unloaded three .270 rounds from the rifle, and placed the rifle in his vehicle. The Court finds that Sergeant Davis took the rifle out of the minivan because he believed it was associated with deer hunting, which was the crime he was investigating. However, the Court also finds that Officer Kite radioed Sergeant Davis and Officer Pike that the shooter was in the truck and that Sergeant Davis admitted that Officer Kite did not tell him that the driver of the minivan had shot at the decoy, had a weapon, or had done anything other than be present at the scene.

Sergeant Davis asked the Defendant to identify himself and what he was doing. The Defendant said the rifle did not belong to him, but instead belonged to Donna Frank. The Defendant told Sergeant Davis that he had been hunting with a muzzleloader earlier that day, but had taken the muzzleloader home. A records check of the van's license tag revealed that the van was registered to Donna Frank. Officer Pike wrote citations for both the Defendant and the driver of the truck for illegal hunting, and they were permitted to leave.

In the week following November 28, 2013, Special [Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")] Agent Lamar "Marty" English, who was investigating the Defendant for an unrelated matter, learned of the hunting citation and asked Sergeant Davis and Officers Kite and Pike to prepare statements detailing their involvement in the stop of the Defendant and seizure of the rifle. The three TWRA officers created these statements on computers, printed them without saving them, and then delivered them to Agent English either directly or through Sergeant Davis. None of the three

TWRA officers retained a copy of his statement. After the statements were created and printed, the TWRA replaced the officers' computers without transferring any data from the old computers. In the spring of 2016, while preparing for trial, the TWRA officers told the prosecutor about the written statements. A search of computer and paper ATF files revealed only the statement of Officer Kite in the paper file in the Knoxville ATF office. ATF Agents English, John Freeman, and Jason Dobbs, the three ATF agents who were assigned to this case, all testified that they did not destroy or intentionally lose the statements of Officer Pike and Sergeant Davis.

## II. Standard of Review

A court must conduct a *de novo* review of those portions of a magistrate judge's report and recommendation to which a party objects unless the objections are frivolous, conclusive, or general. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "Objections disputing the correctness of the magistrate's recommendation, but failing to specify the findings believed to be in error are too general and therefore insufficient." *Stamtec, Inc. v. Anson*, 296 F. App'x 516, 519 (6th Cir. 2008) (citing *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006)). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" made by the magistrate judge. 28 U.S.C. § 636(b)(1).

## III. Analysis

Both the defendant and the government have filed objections to parts of Judge Shirley's R&R. The Court will first address the defendant's objections, and then the government's objection.

## A. The Defendant's Objections

The defendant objects to Judge Shirley's determinations that: (1) Sergeant Davis had reasonable suspicion to stop the defendant in connection with illegal hunting; (2) Sergeant Davis had probable cause to stop the defendant for committing a traffic infraction; and (3) the superseding indictment should not be dismissed. The Court will address each objection in turn. As an initial point, the Court notes that in the R&R Judge Shirley recommended that the Court not suppress certain statements made by the defendant at the scene of his stop. Although the defendant filed an objection to parts of the R&R, he did not raise an objection to Judge Shirley's recommendation regarding the suppression of these statements. As such, the Court will accept this portion of the R&R without further analysis.

### 1. Reasonable Suspicion of Illegal Hunting

The defendant first objects to Judge Shirley's conclusion in the R&R that Sergeant Davis had reasonable suspicion to stop the defendant to investigate his participation in illegal hunting [Doc. 67 p. 36].

A brief, investigative stop, or *Terry* stop, is legally conducted by an officer "who is able to point to specific and articulable facts justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity." *See United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002), *see also Terry v. Ohio*, 392 U.S. 1 (1968). When determining whether an officer had reasonable suspicion to conduct a *Terry* stop, a court considers the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it

5

falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (internal quotation marks omitted). "The scope of law enforcement activities in a [*Terry*] stop depends on the circumstances that originally justified the stop." *Martin*, 289 F.3d at 396. In some situations, the officer is permitted "to ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *See id.*

In the R&R, Judge Shirley found under the totality of the circumstances that Sergeant Davis had reasonable suspicion to stop the defendant and investigate his participation in illegal hunting [Doc. 67 p. 36]. In support of his position that Judge Shirley's finding is incorrect, the defendant raises the following arguments: (1) several facts were not clear as to the record, underscored, and/or not included in the R&R's analysis and conclusion; (2) Judge Shirley improperly based his conclusion in part on a communication between Frank and the defendant shortly after the firing occurred; and (3) Judge Shirley incorrectly analyzed *United States v. Whitmore*. The Court will address each of these arguments in turn.

### a.      Judge Shirley's Consideration of the Record

In the R&R, Judge Shirley found under the totality of the circumstances that Sergeant Davis had reasonable suspicion to stop the defendant and investigate his participation in illegal hunting [Doc. 67 p. 36]. Judge Shirley based his conclusion on a number of factual circumstances, the veracity of which the defendant does not dispute in his objections. In making his finding, Judge Shirley emphasized that Officer Kite saw Frank's truck drive onto Mannis Road and pull into the driveway near the decoy deer, even though the decoy deer was not visible to vehicles traveling from that direction [*Id.*]. The defendant arrived in a

silver minivan only thirty seconds later, and stopped on Mannis Road near the truck [*Id.*].

Judge Shirley noted that "there was no apparent reason to the officers, other than a connection to the truck, for the Defendant to stop there" [*Id.* at 37]. Judge Shirley also noted that the defendant parked the silver minivan in such a way that it blocked in Frank's truck, suggesting that "the drivers of the two vehicles were together and intended to leave at the same time" [*Id.*]. Additionally, Officer Kite had seen a silver minivan, akin to that driven by the defendant, drive past the decoy deer thirty minutes earlier, traveling in a direction from which the decoy deer was visible from the road [*Id.*]. Officer Kite also observed the defendant watch as Frank shot at the decoy deer, and then saw the defendant pull forward to allow the truck to back out of the driveway, later following the truck as the truck drove away [*Id.*].

Furthermore, when Sergeant Davis, who was working with Officer Kite in the deer decoy operation and who stopped the defendant's van at Officer Kite's direction, encountered the defendant's van, the van was "backing rapidly away from where Officer Pike had stopped [Frank's truck] at the top of the hill" [*Id.*]. Judge Shirley found that this apparent attempt by the defendant to flee from the police, rather than waiting for the officers to allow him to pass, gave the officers additional grounds for suspecting that the defendant was involved in illegal hunting with the truck driver [*Id.*].

While he does not contest the veracity of these facts, the defendant argues that Judge Shirley failed to adequately consider certain other facts which, the defendant contends, should have led him to conclude that Sergeant Davis did not have reasonable suspicion to question the defendant. The defendant provides no guidance, however, as to how these facts

support the defendant's argument, or otherwise undermine Judge Shirley's conclusion. Nevertheless, the Court has reviewed these facts, and finds that they do not undermine Judge Shirley's conclusion regarding the existence of reasonable suspicion.

Firstly, the defendant argues that Judge Shirley failed to acknowledge that Mannis Road was a common thoroughfare for local residents [Doc. 48 p. 78], that multiple vehicles traveled down that road at that same time as the defendant's silver minivan [*Id.* at 89, 108], and that no automobiles, including the silver minivan, stopped or slowed down at the decoy spot [*Id.* at 53]. The Court does not find that these facts are significant, as although Mannis Road may be frequently traveled by other drivers, none of these other drivers stopped on Mannis Road approximately thirty seconds after Frank. Furthermore, none of these other drivers parked in such a manner as to block Frank into the driveway, watched as Frank fired on the deer decoy, and then pulled back to permit Frank to exit the driveway.

The defendant next argues that Judge Shirley failed to consider that Officer Kite was unable to identify the driver of the silver minivan in any way other than by the presence of camouflage clothing [*Id.* at 89], that such clothing was common to the area and worn by non-hunters [*Id.* at 90–91], and that the deer decoy would be clearly visible from other places besides northbound traffic [*Id.* at 84–87]. As with the previous facts pointed to by the defendant, the Court does not find these facts significant to the reasonable suspicion analysis. While camouflage clothing may be worn by non-hunters, it is also worn by hunters, and served to allow Officer Kite to identify the defendant. Furthermore, that the deer decoy may have been visible from other areas does not alter the fact that it was likely not visible from

8

the direction from which Frank approached, but was visible from the direction from which the defendant drove by thirty minutes prior to Frank's arrival.

The defendant next asserts that Judge Shirley did not consider that the sole basis in Officer Kite's testimony for his decision to stop the minivan amounted to the passing of the silver minivan some thirty minutes earlier and the reappearance of the silver minivan on the scene prior to the firing on the decoy deer by Frank [*Id.* at 58, 93–94, 102]. The Court does not find that this is an accurate characterization of Officer Kite's testimony. Rather, this characterization ignores Officer Kite's testimony that the defendant parked in such a way as to block the truck in the driveway [*Id.* at 56], that after Frank fired his shot the defendant pulled forward to allow Frank to back out [*Id.* at 57], and that the defendant subsequently followed Frank after Frank drove off [*Id.*]. Furthermore, it ignores Sergeant Davis's testimony that after Officer Pike stopped Frank's truck, the defendant rapidly backed his minivan away from Officer Pike's location [*Id.* at 116]. Therefore, contrary to the defendant's assertion, the decision to stop the minivan was not based merely on the passing of the minivan some thirty minutes earlier and the minivan's subsequent appearance on the scene.

Finally, the defendant argues that Judge Shirley failed to consider that the officers did not attempt to determine if either of the relevant landowners in this matter had on the day in question, or recently, authorized hunting from their private land, nor had the officers received contemporaneous complaints of illegal hunting for that day [*Id.* at 67, 83, 93–95, 105]. Considering the standard for reasonable suspicion, the Court does not find that these facts are significant. *See Arvizu*, 534 U.S. at 274. Officer Kite testified that he and his

9

partner had received several complaints about illegal hunting in the Mannis Road area [*Id.* at 47], and that he had received permission from the landowner to set up the decoy deer in order to catch illegal hunters [*Id.* at 51]. To require the officers to have checked with the relevant landowners on Mannis Road at the beginning of each day, as defendant appears to advocate, would be to mandate a higher standard than the law requires. Upon stopping the defendant, the officers were not required to be certain that criminal activity was taking place; they merely needed to have a reasonable suspicion that such was taking place. *See United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). The complaints of illegal hunting from Mannis Road, as well as the permission of the person believed to be the landowner to place a deer decoy on her land in order to prevent illegal hunting, were sufficient to provide the officers with the reasonable suspicion that the hunting done on Mannis Road was done illegally.

In sum, the Court does not find that the factual circumstances pointed to by the defendant in his objection impact Judge Shirley's conclusion regarding the existence of reasonable suspicion.

### b. The Defendant's Alleged Communications with Frank

The defendant next argues that Judge Shirley erroneously based his reasonable suspicion conclusion in part on the alleged communication between Frank and the defendant shortly after Frank's firing on the decoy deer. As an initial point, the Court notes that the R&R does not include a specific finding of fact with respect to whether the defendant and Frank communicated subsequent to Frank's firing on the deer, although Judge Shirley did note in his analysis of the reasonable suspicion issue that "it appeared to Officer Kite that the

10

drivers of the truck and minivan were signaling to each other" [Doc. 67 p. 37]. The defendant argues that Judge Shirley's assertion is not supported by Officer Kite's testimony, in which the defendant argues Officer Kite indicated "that the only activity by Mr. Cline that Officer Kite could actually determine at the time was that [the defendant] briefly opened the door of his car" [Doc. 69. p. 3].

While the Court notes that Officer Kite stated in his testimony that he could not see any hand signals, the Court also notes that he testified that he could tell that the defendant's arm was moving in a manner perhaps indicative of signaling [Doc. 48 pp. 99–100]. Furthermore, the Court does not find that whether the defendant made hand signals to the shooter, or whether he merely opened the door to his car, has any impact on the outcome of the reasonable suspicion determination. Even were the defendant to have merely opened the door to his car subsequent to Frank firing at the deer decoy, the other factual circumstances discussed by Judge Shirley support a finding of reasonable suspicion. Furthermore, even the mere opening of the door, considering the close proximity of the defendant's van and Frank's truck, supports the suspicion that the defendant and Frank were working together. As such, the Court disagrees with the defendant that Judge Shirley's reliance on the alleged hand signals between the defendant and the shooter invalidates Judge Shirley's finding of reasonable suspicion.

### c.     Judge Shirley's Treatment of *United States v. Whitmore*

Finally, the defendant argues that Judge Shirley incorrectly analyzed *United States v. Whitmore*, which the defendant argues supports a finding of no reasonable suspicion in this case. 314 F. Supp. 2d 690 (E.D. Mich. 2004). In *Whitmore*, the district court found that a

police officer did not have reasonable suspicion to question an individual for criminal public indecency, where the individual was urinating "in a national forest, in the dark of night, miles from buildings and encampments." *Id.* at 699. The district court believed that considering the circumstances, especially the remote location in which the individual was urinating, the individual's conduct did not fall within the criminal public indecency statute. *See id.*

The defendant argues that his case is similar, because his conduct did not fall within a criminal statute. He reiterates his point that hunting with the landowners' permission does not fall within the parameters of the relevant criminal statute in this case, and argues that the officers were not certain of the relevant landowners, and whether they had given permission for individuals to hunt on their land.

As the Court has already noted, it is not persuaded by the defendant's argument regarding the officers' communication with the relevant landowners, but rather, the Court finds that the complaints which the officers received, as well as the permission to place the decoy deer, were sufficient to establish reasonable suspicion of the illegality of any hunting by the defendant.

Furthermore, the Court is not persuaded by the defendant's argument that his conduct did not fall within the parameters of the criminal hunting statute at issue. Tenn. Code Ann. § 70-1-101(a)(19) defines hunting as including "chasing, driving, flushing, attracting, pursuing, worrying, following after or on the trail of, *searching for*, trapping, shooting at, stalking, or lying wait for, any wildlife, whether or not such wildlife is then or subsequently captured, killed, taken, or wounded *and every act of assistance to any other person*." *See Id.* (emphasis added). The Court agrees with Judge Shirley that it was reasonable for the

12

officers to suspect that the defendant, based on all the facts which the Court has already discussed[2], was assisting Frank by directing him to the decoy deer. This is consistent with Officer Kite's testimony that it is commonplace for individuals committing wildlife violations to work in pairs, using two cars [Doc. 48 p. 55]. Such assistance is included in the definition of hunting, as the Tennessee code's definition of hunting includes "every act of assistance." *See* Tenn. Code. Ann. § 70-1-101(a)(19).

In addition, the statute is not limited to the act of shooting at wildlife, but rather encompasses "searching for" wildlife. *Id.* The defendant's parking his van along Mannis Road near the location of the decoy deer thirty minutes after the officers had observed a van akin to the defendant's drive by, as well as the defendant's actions both immediately before and following Frank's shooting at the decoy deer made it reasonable for the officers to suspect that the defendant was involved in searching for wildlife in the manner included in the statutory definition of hunting. Therefore, in contrast to *Whitmore*, in this case the officers had reasonable suspicion to believe that the defendant was engaging in proscribed conduct.

In sum, the Court finds that none of the defendant's arguments are well taken, and agrees with Judge Shirley that the officers had reasonable suspicion to stop the defendant in order to investigate his participation in illegal hunting. As such, the Court will overrule this objection.

---

[2] Contrary to the defendant's assertions in his objection, these facts are not "only unsupported conjecture based upon [the defendant] being present at the time" [Doc. 68 p. 4].

## 2.  Probable Cause of Traffic Violation

The defendant also objects to Judge Shirley's finding that Sergeant Davis had probable cause to stop the defendant for a traffic violation in his presence [Doc. 69 p. 4].  As an initial point, the Court notes that as it has found that Sergeant Davis had reasonable suspicion to investigate the defendant regarding his involvement in illegal hunting, his stop of the defendant's minivan was lawful.  As such, the Court need not determinate whether Sergeant Davis had, in the alternate, probable cause to stop the defendant for committing a traffic violation.  Nevertheless, because Judge Shirley discussed the issue in the R&R, and because the defendant objected to Judge Shirley's determination, the Court will consider the issue.

The defendant argues that Judge Shirley erred in concluding that Sergeant Davis had probable cause to stop him based on either a traffic violation, or an attempt to evade the police.  In the R&R, Judge Shirley concluded that because Sergeant Davis encountered the defendant "rapidly backing away from Officer Pike," Sergeant Davis had probable cause to stop the defendant for "driving recklessly while attempting to evade being stopped by Officer Pike" [Doc. 67 p. 40].  According to the R&R, the relevant traffic violations are violations of Tenn. Code. Ann. § 55-8-104(a), which provides that "no person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control or regulate traffic," and Tenn. Code Ann. § 55-10-205(a) which proscribes driving "any vehicle in willful or wanton disregard for the safety of persons or property." *See* Tenn. Code. Ann. §§ 55-8-104(a),  55-10-205(a).

14

The defendant raises a number of arguments as to why Judge Shirley's finding is incorrect, all of which the Court has considered. The Court does not find, however, that the arguments have merit. Firstly, the defendant argues, based on Officer Kite's testimony, that TWRA officers are not trained to perform, and typically do not perform, traffic stops or vehicle violations [Doc. 69 p. 5]. The Court notes, however, that Officer Kite also testified that TWRA officers do have some familiarity with vehicle and traffic offenses, and that in certain situations they perform traffic stops [Doc. 48 p. 61]. Furthermore, Officer Kite stated that while TWRA officers are focused on enforcing wildlife and boating laws, TWRA officers have police powers, and are empowered to enforce other areas of the law, which the defendant does not dispute [*Id.* at 60–61].

Next, the defendant argues that because there were no vehicles on the roadway other than the defendant's and Frank's, he was not backing up in an unsafe manner, or in a manner prohibited by Tenn. Code Ann. § 55-10-205(a). The defendant also raises a variety of additional arguments relating to Sergeant Davis's knowledge of the relevant vehicle codes and lack of testimony regarding his having stopped the defendant for a traffic violation.

The defendant does not address, however, Tenn. Code Ann. § 55-8-104(a), and that the defendant was rapidly backing away from Officer Pike, who had his blue lights activated [Doc. 48 p. 116]. He also does not address that the defendant ultimately backed into the driveway of a house despite Sergeant Davis activating his own lights and sirens [*Id.*]. Considering these factual circumstances, as well as Sergeant Davis's testimony that the defendant was backing away from Officer Pike at a "fairly high rate of speed," the Court finds that Officer Davis had probable cause to stop the defendant for driving recklessly while

15

attempting to evade being stopped by Officer Pike [*Id.*].  In sum, the Court agrees with Judge

Shirley's conclusion that, in the alternative, Sergeant Davis had probable cause to stop the

defendant for recklessly driving while attempting to evade being stopped by Officer Pike.

As such, the defendant's objection to Judge Shirley's probable cause determination will be

overruled.

### 3.    Dismissal Pursuant to Fifth and Fourteenth Amendments

The defendant lastly objects to Judge Shirley's decision not to dismiss the

superseding indictment due to law enforcement's loss of two witness statements made close

in time to the November 28, 2013, minivan stop.[3]  The defendant argued to Judge Shirley

that the loss of these statements violated his due process rights under the Fifth and

Fourteenth Amendments.  In the objection, however, the defendant merely asserts that he has

presented circumstantial evidence of bad faith, identifies that evidence in a very general

manner, and further asserts that he has established the exculpatory nature of the lost

statements.  In so doing, he neither directs the Court to specific findings of the R&R believed

to be in error regarding bad faith, nor presents any specific arguments regarding the existence

of bad faith.  Considering the general nature of this objection, the Court considers it waived.

*See Stamtec*, 296 F. App'x at 519; *see also VanDiver v. Martin*, 304 F. Supp. 2d 934, 937

(E.D. Mich. 2004) ("A general objection, or one that merely restates the arguments

previously presented is not sufficient to alert the court to alleged errors on the part of the

---

[3] The Court notes that the defendant also argued to Judge Shirley that the loss of ammunition seized at the time of the stop should result in the dismissal of the superseding indictment.  The defendant makes no specific mention of the ammunition in his objection, and the Court agrees with Judge Shirley that there is no evidence in the record that the ammunition was ever seized, much less lost, by the government.

magistrate judge. An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as the term has been used in this context.").

Even were the Court to consider this objection, it would not be well taken. The Court agrees with Judge Shirley that the statements involved in this case constitute potentially exculpatory impeachment evidence, making them subject to the test established by *Arizona v. Youngblood*, 488 U.S. 51 (1988). In order to show a due process violation under *Youngblood*, the defendant must show that the government acted in bad faith in failing to preserve the evidence. *See id.* at 58. Negligence, or even gross negligence, does not rise to the level of bad faith. *See United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

Upon review of the record, the Court does not find any evidence indicative of bad faith. While the Court agrees with Judge Shirley that the loss of the statements may have been due to negligence, there is no evidence that the statements were either deliberately destroyed or internationally lost [Doc. 67 p. 57]. Thus, even though the government may have been negligent, "there is no evidence that it acted in bad faith." *See id.* at 218. Similarly, none of the additional circumstances generally identified in the defendant's objection are indicative of bad faith on the part of the government. The Court notes as well that Judge Shirley found in the R&R that the defendant is unable to satisfy the additional requirements of the *Youngblood* test, a finding which the defendant does not mention in his objection [*Id.* at 58]. As such, the Court agrees with Judge Shirley's decision not to dismiss the superseding indictment for Fifth and Fourteenth Amendment violations and will overrule the defendant's objection in this regard.

17

### B. The Government's Objection

The government also filed an objection to the R&R, in which it objected to Judge Shirley's recommendation that the Court suppress the rifle found in the defendant's minivan. In the R&R, Judge Shirley rejected the government's argument that the seizure of the gun fell within the "plain view exception," and thus did not violate the defendant's Fourth Amendment rights [Doc. 67 p. 46]. In finding that the plain view exception did not apply, Judge Shirley determined that the incriminating nature of the hunting rifle was not "immediately apparent" to the officers, because the officers knew that the defendant had not fired that gun at the decoy deer [*Id.* at 44.] The government argues that this finding is incorrect because Judge Shirley did not consider the full range of activity prohibited by the statute, which the government asserts goes beyond the act of shooting at wildlife.

In order for the plain view exception to apply, the evidence must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a pace from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994). Because Judge Shirley found that Sergeant Davis had reasonable suspicion to question the defendant regarding illegal hunting, and alternately probable cause to stop him for a traffic violation, findings with which the Court has agreed, Sergeant Davis was lawfully in a place from where the rifle was viewable. Additionally, based on Sergeant Davis's testimony, the rifle was in plain view to Sergeant Davis as he looked through the window into the car, and the parties do not dispute that Sergeant Davis had a lawful right of access to the rifle [Doc. 48 p. 123]. *See* Tenn. Code. Ann. § 70-6-201 (authorizing wildlife officers to

"seize and take possession of any and all . . . guns . . . that have been used, transported, or possessed contrary to any laws or regulations promulgated by the fish and wildlife commission.").

The Court next turns to the remaining, and disputed, element in the plain-view exception analysis, whether the criminality of the rifle was "immediately apparent" to Sergeant Davis. *See United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002). Finding that the criminality of an item is immediately apparent "does not demand an unduly high degree of certainty; rather, a plain view seizure is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir. 1997). In order to determine whether the criminality of an item is immediately apparent, district courts in this circuit consider several factors, none alone being determinative: "(1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions." *Id.*

In the R&R, Judge Shirley analyzed these three factors and concluded that the incriminating nature of the rifle was not immediately apparent. In reaching this conclusion, Judge Shirley placed substantial weight on the fact that the officers knew that the rifle had not been fired at the decoy deer, and thus, had not been used in a hunting violation. In its objection, the government argues that Judge Shirley did not consider the full range of

conduct included in the statutory definition of hunting. After considering the R&R and the objection, all in light of relevant law, the Court finds that the government's argument is well taken, and that the incriminating character of the rifle was immediately apparent to Sergeant Davis.

In reaching the conclusion that the incriminating nature of the rifle was immediately apparent to Sergeant Davis, the Court is guided in particular by the second factor from *Calloway*—that the "intrinsic nature of appearance of the seized object gives probable cause to associate it with criminal activity." *Id.* While Judge Shirley found in the R&R that this factor weighed against the criminality of the rifle being immediately apparent because Sergeant Davis knew that the rifle had not been fired at the decoy and thus had not been used in a hunting offense, the Court ultimately disagrees with this conclusion. As Judge Shirley noted in the R&R, the relevant statute defines hunting as "chasing, driving, flushing, attracting, pursuing, worrying, following after the trail of, *searching for*, trapping, shooting at, stalking, or lying in wait for, any wildlife, whether or not such wildlife is then or subsequently captured, killed, taken, or wounded *and every act of assistance to any other person*." Tenn. Code Ann. § 70-1-101(a)(19) (emphasis added). Thus, the statutory definition of hunting includes more than the act of shooting at wildlife, but rather also includes the act of searching for wildlife, as well assisting another person in their own hunting.

Applying this definition, the Court finds that there was probable cause to associate the rifle with illegal hunting because it was indicative that the defendant was assisting Frank. As

noted by Officer Kite in his testimony, it is commonplace for individuals committing wildlife offenses to work in pairs, and also for both individuals to be armed [Doc. 48 pp. 55, 163]. Considering the other evidence available to the officers that the defendant was working in tandem with Frank, which the Court has already discussed, the rifle was further evidence that the defendant was working with Frank, providing assistance.

In addition to indicating that the defendant was working in conjunction with Frank, the rifle was also indicative of the defendant "searching for" wildlife on his own account, which also constitutes hunting. *See* Tenn. Code Ann. § 70-1-101(a)(19). Furthermore, the Court notes that while the statutory definition of hunting includes "searching for" wildlife, it specifically excludes searching for wildlife "by an unarmed person solely or the purpose of watching wildlife or taking pictures of wildlife." *Id.* The rifle, regardless of whether it was fired, served to make the defendant armed, taking him out of this possible exclusion of the definition of hunting. Therefore, the Court finds that there was probable cause to associate the rifle with illegal hunting, both because it was indicative of the defendant assisting Frank, and because it was indicative of the defendant searching for wildlife.

The Court also finds that the third factor from *Calloway*—"whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions"—supports finding that the criminality of the rifle was immediately apparent. *See Calloway*, 116 F.3d at 1129. Sergeant Davis suspected that the defendant was involved in illegal hunting when he viewed the rifle through the van window. As the Court has already noted, the rifle was indicative of hunting as it is defined in the Tennessee code. Sergeant Davis's viewing of the

21

rifle through the window constitutes an "instantaneous sensory perception," and weighs in favor of the criminality of the rifle being immediately apparent. *Id*; *see also United States v. Lijewski*, 39 F. Supp. 3d 917, 928 (E.D. Mich. 2014) (finding that the instantaneous sensory perception factor weighed against suppression of a shotgun when the officer could tell based solely on his instantaneous visible perception that the gun was illegal). Therefore, the Court finds that the third factor weighs in favor of the incriminating nature of the rifle being immediately apparent.

Finally, the Court finds that the first *Calloway* factor, which looks to the nexus between the rifle and the violation being investigated, also weighs in favor of the incriminating nature of the rifle being immediately apparent. The Court is mindful that in the R&R Judge Shirley found there to be no nexus because Sergeant Davis knew that the rifle had not been fired at the decoy deer. However, as discussed above, and considering the scope of activities included within the statutory definition of hunting, the Court finds that there is in fact a nexus between the rifle and the hunting violation which the officers were investigating. *See* Tenn. Code. Ann. § 70-1-101(a)(19). When Sergeant Davis stopped the defendant, he did so to investigate his reasonable suspicion that the defendant was engaged in illegal hunting. As the Court has already highlighted, the rifle is indicative both of the defendant assisting Frank, and also of the defendant searching for wildlife on his own account. Both activities fall within the statutory definition of hunting. Therefore, because the rifle is indicative of hunting as it is statutorily defined, and because Sergeant Davis was investigating his reasonable suspicion that the defendant was hunting illegally, the Court

finds that there is a nexus between the rifle and the violation being investigated. Thus, the Court finds that the first *Calloway* factor weighs in favor of the incriminating nature of the rifle being immediately apparent.

The Court notes that in finding that the incriminating nature of the rifle was not immediately apparent, Judge Shirley noted that guns are not inherently illegal to possess. While the Court agrees with Judge Shirley that there is nothing inherently unlawful about possessing a rifle, the Court believes that due to the other evidence that the defendant was working with Frank in engaging in illegal hunting, particularly the evidence which the Court has discussed in this opinion, the rifle, which is indicative of hunting, assumed "an incriminating nature." *See United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) ("Although guns and ammunition may be lawfully possessed, in the context of . . . hunting out of season these items assume an incriminating nature.").

In sum, although the Court is mindful of Judge Shirley's recommendation that the rifle be suppressed, the Court ultimately disagrees that the criminality of the rifle was not immediately apparent. As such, the Court finds that the plain view exception is applicable in this case, and that the seizure of the rifle did not violate the defendant's Fourth Amendment rights. Thus, the Court will sustain the government's objection and finds that the rifle should not be suppressed. Because the Court finds no Fourth Amendment violation, it need not consider Judge Shirley's recommendation regarding the applicability of the exclusionary rule.

## IV.  Conclusion

For the reasons discussed herein, and upon careful and *de novo* review of the record and the law, the Court hereby **OVERRULES** the defendant's objection to the R&R [Doc. 68] and **SUSTAINS** the government's objection [Doc. 70].  The Court **REJECTS in part** the R&R [Doc. 67] to the extent that the gun will not be suppressed, and **ACCEPTS** the R&R in all other respects. The Court hereby **DENIES** the defendant's motions to suppress [Docs. 35, 59] and the defendant's motion to dismiss the indictment [Doc. 43].

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE